# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 9, 2016       Decided May 26, 2017

No. 16-5118

EPSILON ELECTRONICS, INC.,
APPELLANT

v.

UNITED STATES DEPARTMENT OF THE TREASURY, OFFICE OF
FOREIGN ASSETS CONTROL, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:14-cv-02220)

*Teresa N. Taylor* argued the cause and filed the briefs for appellant.

*Eric S. Volkman* was on the brief for *amicus curiae* JPM Legal Advisors Worldwide Limited in support of appellant.

*Lewis S. Yelin*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, and *Douglas N. Letter* and *Sharon Swingle*, Attorneys.

Before: ROGERS and GRIFFITH, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

Opinion concurring in part and dissenting in part filed by *Senior Circuit Judge* SILBERMAN.

GRIFFITH, *Circuit Judge*: In 1995, President Clinton imposed trade sanctions against Iran that are enforced by the Office of Foreign Assets Control within the Department of the Treasury. OFAC is authorized to impose civil penalties against any person who exports goods to a third party who it has reason to know intends to send them to Iran. The principal question raised by this appeal is whether OFAC must also show that the goods actually ended up in Iran. We agree with the agency that the government need not make that showing and affirm the district court on that ground. But we also conclude that OFAC did not adequately explain parts of its determination that the exporter here had reason to know that its shipments would be sent on to Iran.

I

When the President identifies an "unusual and extraordinary threat" to the American economy, national security, or foreign policy that originates from abroad, *see* 50 U.S.C. § 1701, the International Emergency Economic Powers Act authorizes him to declare a national emergency and address the threat by regulating foreign commerce, *see id.* § 1702. In 1995, President Clinton determined that Iran's "support for international terrorism, its efforts to undermine the Middle East peace process, and its efforts to acquire weapons of mass destruction" represented a national

emergency, *see* Iranian Transactions Regulations, 77 Fed. Reg. 64,664, 64,664 (Oct. 22, 2012), and, invoking his authority under the Act, imposed comprehensive trade sanctions on Iran by executive order, *see* Exec. Order No. 12,959, 60 Fed. Reg. 24,757, § 1 (May 6, 1995).

OFAC implemented the President's executive order in September 1995 by promulgating the Iranian Transactions and Sanctions Regulations, *see* 60 Fed. Reg. 47,061 (Sept. 11, 1995), which are now codified, as amended, at 31 C.F.R. pt. 560. Among other prohibitions, the regulations forbid "the exportation, reexportation, sale, or supply, directly or indirectly . . . of any goods, technology, or services to Iran" by United States individuals and businesses, including exportation to a third country with "knowledge or reason to know" that the goods are "intended specifically" for reexportation to Iran. *See* 31 C.F.R. § 560.204.

The agency has invoked that prohibition against appellant Epsilon Electronics, a California-based wholesaler of sound systems, video players, and other accessories for cars. The company's wares can be found across the globe, from Latin America to Africa and the Middle East. Asra International Corporation, a distributor based in Dubai, has been one of Epsilon's trading partners. Between 2008 and 2012, Epsilon sent thirty-nine shipments of consumer goods to Asra, valued at about $3.4 million.

OFAC began investigating Epsilon in 2011, when the agency learned about a 2008 shipment from Epsilon's California headquarters to an address in Tehran, Iran. In response to an administrative subpoena, Epsilon's president denied knowledge of the shipment and suggested that a lower-

level employee had sent the package without the company's knowledge.

Later in 2011, OFAC also learned that Epsilon had received multiple wire transfers from a Dubai bank, made on behalf of Asra International. The agency examined Asra's website, which touted the company's success in the Iranian market, contained a directory of dealers who were all located in Iran, and displayed photos from trade shows in various Iranian cities. Some of these photos also appeared on Epsilon's website. OFAC suspected that the company's shipments to Asra were "destined for Iran," and opened a second investigation on Epsilon in December 2011. The agency issued an administrative subpoena to Epsilon's bank, seeking information about the company's transactions with Asra.

In the meantime, OFAC decided to close its investigation of the 2008 shipment. In January 2012, the agency sent Epsilon a letter explaining that the shipment appeared to have violated OFAC regulations, and warning that those regulations "prohibit virtually all" American trade with Iran. Appellant's App. [A.A.] 94. OFAC explained that it would not penalize Epsilon for the shipment but that the agency could take this apparent violation into account in any future case.

But OFAC did not close its parallel investigation of Epsilon's dealings with Asra. In May 2012, the agency sent Epsilon another administrative subpoena, requesting further details on the company's transactions with Asra and with Iran. Epsilon responded that it had no dealings with Iran and that none of its shipments to Asra were intended for Iran. The

company submitted invoices chronicling thirty-four shipments to Asra.

Between February and May 2012, while OFAC's investigation continued, Epsilon sent Asra five more shipments. During this period, Epsilon managers corresponded by email with an Asra manager, Shahriar Hashemi, who described plans to launch a Dubai retail store under "Asra's flag." A.A. 118. The emails record Hashemi and Epsilon negotiating several orders, and show Hashemi mentioning plans for his showroom, complaining about another Dubai shop selling Epsilon products, worrying about whether Epsilon products could endure Dubai's heat, and anticipating sales to African and Central Asian customers. An Epsilon manager promised Hashemi that the Dubai retail market was "all yours." *See* A.A. 119.

In May 2014, OFAC tentatively concluded that all thirty-nine of Epsilon's shipments to Asra violated 31 C.F.R. § 560.204 because each was made with knowledge, or reason to know, that Asra intended to reexport the goods to Iran. The agency sent Epsilon a Prepenalty Notice, declaring its intent to impose a civil monetary penalty of $4,073,000, subject to Epsilon's response. OFAC arrived at that dollar amount by applying its penalty guidelines, which required the agency to determine whether any of the violations were voluntarily disclosed and whether any were "egregious." *See generally* 31 C.F.R. pt. 501, App. A. OFAC found that none of Epsilon's violations was voluntarily disclosed, and that the last five shipments, made after Epsilon received OFAC's January 2012 cautionary letter, were egregious. Though the agency has authority to depart upward or downward from the guideline penalty, it decided not to do so after balancing the aggravating and mitigating factors.

In July 2014, OFAC issued a final Penalty Notice, formally imposing a $4,073,000 civil penalty. The agency had not been persuaded by Epsilon's response to the Prepenalty Notice, which again denied any knowledge or reason to know that Asra distributed Epsilon's products in Iran. The Penalty Notice explained that "multiple facts tend to show that the goods exported to Asra were sent to Iran and that Epsilon knew or had reason to know that the goods were intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran." Although the Notice recited much of the evidence against Epsilon, it never mentioned the emails between Epsilon management and Hashemi.

The issuance of the Penalty Notice was final agency action. *See* 31 C.F.R. § 560.704. In December 2014, Epsilon sued OFAC in district court. Epsilon's complaint sought declaratory and injunctive relief against enforcement of the civil penalty. On March 7, 2016, the district court granted summary judgment in favor of the government. *See Epsilon Elecs., Inc. v. U.S. Dep't of Treasury*, 168 F. Supp. 3d 131, 147 (D.D.C. 2016).[1]

Epsilon timely appealed. We have jurisdiction under 28 U.S.C. § 1291, and review de novo the district court's entry of summary judgment in favor of the government. *Islamic Am. Relief Agency v. Gonzales* (*IARA*), 477 F.3d 728, 732 (D.C.

---

[1] Epsilon argues that the district court erred by failing to award it attorney's fees and costs as the "prevailing party" in an action against the United States under 28 U.S.C. § 2412(d)(1)(A). The company, of course, was not the prevailing party below. In light of our disposition today, Epsilon may move the district court for fees and costs in the first instance. We take no position on the propriety of such an award.

Cir. 2007). As the Administrative Procedure Act requires, our review is "highly deferential" to the agency, meaning we may set aside OFAC's action "only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *IARA*, 477 F.3d at 732 (quoting 5 U.S.C. § 706(2)(A)). Under that standard, we will uphold agency findings that are supported by substantial evidence, even if we might have reached a different conclusion in the first instance. *See, e.g.*, *United Steel Workers Int'l Union v. Pension Benefit Guar. Corp.*, 707 F.3d 319, 325 (D.C. Cir. 2013). That deference has a caveat: although the APA does not permit us to substitute our judgment for the agency's, we must ensure that the agency has "articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

Epsilon asks us to set aside these fundamental doctrines of administrative law by reviewing OFAC's decision de novo instead of under the APA's arbitrary-and-capricious standard. We have described de novo review in an APA case as "extraordinary and rare," so rare, in fact, that we have never done so. *Zevallos v. Obama*, 793 F.3d 106, 112 (D.C. Cir. 2015). Although dicta in one of our cases left the door open to such scrutiny where the agency's factfinding procedures are "severely defective," *Nat'l Org. for Women v. Soc. Sec. Admin.*, 736 F.2d 727, 745 (D.C. Cir. 1984) (Mikva & McGowan, JJ., concurring), we need not decide what such an analysis would entail, because Epsilon failed to preserve any argument for de novo review before the district court. *See* Mem. Supp. Pl.'s Mot. in Opp'n to Defs.' Mot. Summ. J. 9, *Epsilon*, 168 F. Supp. 3d 131 (No. 14-2220 (RBW)), ECF No.

19-1 [hereinafter Epsilon Mot. Summ. J.].[2] Accordingly, we will adhere to the "arbitrary [and] capricious" standard set out in 5 U.S.C. § 706(2)(A).

## II

Epsilon offers three challenges to the civil penalty that OFAC imposed. First, the company contends that none of its thirty-nine shipments to Asra were in violation of the Iranian Transactions and Sanctions Regulations. Second, Epsilon claims that the amount of the penalty assessed is not only arbitrary and capricious, but also an "excessive fine" forbidden by the Eighth Amendment. Third, the company argues that its due process rights were violated because it had insufficient notice of the evidence that OFAC intended to rely on.

## A

We first consider whether OFAC properly found Epsilon liable for thirty-nine violations of section 560.204 of the Iranian Transactions and Sanctions Regulations. In addressing that issue, we face a threshold question of regulatory interpretation. To hold a party liable for a breach of section

---

[2] Epsilon faults the district court's factual findings, on the ground that OFAC failed to file "the whole Administrative Record" with the court below. Appellant Br. 24. OFAC in fact complied with District Court Rule 7(n), which governs presentation of the record to the court, and with the district court's March 16, 2015 order to "file the administrative record," by filing a certified list of contents of the record, and by attaching to its motion for summary judgment those portions of the record on which it relied. Epsilon was given an opportunity to file additional record excerpts with the court, and did so.

560.204, must OFAC prove that goods shipped by that party actually arrived in Iranian territory? Or can liability rest solely on a showing that the party shipped goods to a third party, with reason to know that the recipient specifically intended to reexport them to Iran?

Epsilon advances the former position, and contends there is no substantial evidence that the thirty-nine shipments at issue ever entered Iran. OFAC responds that the regulation's plain text does not require such a showing. *See* Appellee Br. 29 ("Under the unambiguous terms of the regulation, actual reexportation to Iran by the person in the third country is not required for a violation."). The agency also urges us to defer to its interpretation if we find the regulation ambiguous. *See Auer v. Robbins*, 519 U.S. 452, 461 (1997). However, the reading of section 560.204 that OFAC has adopted is the same reading that we would have adopted in the absence of any agency interpretation. We therefore need not decide whether *Auer* deference would be appropriate in this instance.[3]

i

We begin with the regulation's text. *See In re England*, 375 F.3d 1169, 1177 (D.C. Cir. 2004). Section 560.204 provides:

---

[3] We take no position on whether OFAC could, in the future, adopt Epsilon's reading of section 560.204, and receive deference on that interpretation. We merely hold that OFAC's current interpretation is the most natural and the most consistent with the plain text. *Auer* may require a court to defer to a regulatory reading it would never have independently reached. *See Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1330 (D.C. Cir. 1995).

> Except as otherwise authorized pursuant to this part . . . the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:

> (a) Such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran . . . .

The analysis at first glance appears straightforward. The regulation prohibits "the exportation [] of any goods [] to a person in a third country undertaken with knowledge or reason to know that [s]uch goods [] are intended specifically for [] reexportation [] to Iran." *See id.* That prohibition, on its face, has only two elements: (1) the exportation of goods to "a person in a third country" and (2) "knowledge or reason to know" that the third-country recipient plans to send the goods on to Iran. *Id.* The goods' actual arrival in Iran is not mentioned, meaning that proof of this event is not required for a liability finding under the prohibition on third-country exports.

Epsilon, in response, points to the word "including." The rule just discussed is "includ[ed]" within a broader prohibition on "exportation . . . to Iran." *See id.* The company argues that the "word 'including' makes clear there is no separate prohibition on exports to third countries independent from re-

exportation to Iran." Appellant Reply Br. 6. This argument relies on an unstated premise: that goods have not been exported "to Iran" until they actually reach Iranian territory. OFAC, by contrast, assumes that the phrase "to Iran" refers to the sender's intent, not the ultimate arrival of the goods. In other words, on OFAC's interpretation, goods have been "export[ed] . . . to Iran" when the exporter puts them in transit, with Iran as the intended final destination.[4]

We think OFAC's reading more closely aligns with ordinary English usage. Suppose you put a birthday card in the mail, addressed to your brother. While the card is still en route, your mother asks you, "Did you send a card to your brother?" In line with OFAC's usage, you would respond, "I sent a card to him, but it hasn't arrived yet," because you put the card in transit, intending it to reach him. Following Epsilon's usage, though, you would have to say, "I didn't send a card to him," because the card has not yet arrived. (Stranger still, if you were uncertain whether the card had reached his mailbox, you might answer, "I don't know if I

---

[4] Contrary to Epsilon's suggestion, this interpretation does not render the attempt provision of the Iranian sanctions regulations superfluous. *See* 31 C.F.R. § 560.203(a) (prohibiting any transaction that "attempts to violate any of the prohibitions set forth in this part"). Though we do not intend to comprehensively define what would constitute an attempt to violate section 560.204, we note that attempt liability requires only a "substantial step" toward commission of the proscribed act (plus the requisite mental state). *Cf., e.g.*, *United States v. Hite*, 769 F.3d 1154, 1162 (D.C. Cir. 2014) (discussing the meaning of "attempt" in federal criminal law). For example, a merchant who signs a sales contract with an Iranian business, but has not yet put any goods in transit for export, might be liable for an attempt to violate section 560.204, but not for an actual violation of that section.

sent a card to him or not.") The first statement is more consistent with the way ordinary English speakers talk. *Cf. Bond v. United States*, 134 S. Ct. 2077, 2090 (2014) (rejecting a linguistic usage that "no speaker in natural parlance" would employ).

The agency's argument draws further support from the definition of the word "exportation" in export rules that are closely related to OFAC's. The regulations in question are the Department of Commerce's Export Administration Regulations (EAR) which control the export of items that have both civilian and military uses. *See* 15 C.F.R. § 730.3. The Iranian transaction regulations do not expressly incorporate this EAR definition, but they often refer to the EAR. For example, OFAC's approval of some export activities is conditioned on compliance with the EAR. *See, e.g.*, 31 C.F.R. §§ 560.530, 560.540. The EAR defines "export" as "an actual shipment or transmission of items out of the United States." 15 C.F.R. § 772.1 (2014). In other words, the occurrence of an "export" is not contingent on the goods' arrival at their final destination. *See id.* What's more, "the export or reexport of items subject to the EAR that will transit through [Country A] or be transshipped in [Country A] to [Country B] or are intended for reexport to [Country B], are deemed to be exports *to* [Country B]." *Id.* § 734.2(b)(6) (2014) (emphasis added).[5] Note the use of forward-looking language: the export of items "that *will transit*" or "*are intended* for reexport." If an exporter can say, "I have exported items to Country B that will transit through Country

---

[5] A 2016 rule moved both of these definitions to a newly created 15 C.F.R. § 734.13, but did not alter the substance of the definitions. *See* Revisions to Definitions in the Export Administration Regulations, 81 Fed. Reg. 35,586, 35,591 (June 3, 2016).

A," then exportation to B occurs before "transit through" A, and thus before the goods reach A, let alone B. The EAR definition of "export" indicates that OFAC's reading of section 560.204 reflects the meaning of that word as it is used in trade regulations.

The EAR, like OFAC's interpretation of section 560.204, embodies the understanding, drawn from broader legal usage, that exportation is an "act," specifically, "[t]he act of sending or carrying goods and merchandise from one country to another." *Exportation*, BLACK'S LAW DICTIONARY (10th ed. 2014). An "act," in turn, is an actor's voluntary conduct: for example, placing goods on a ship bound for Iran. *See Act*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("The word 'act' . . . denote[s] an external manifestation of the actor's will and does not include any of its results, even the most direct, immediate, and intended." (quoting RESTATEMENT (SECOND) OF TORTS § 2 (1965))). If an exporter has taken all the steps he must personally take to put goods in transit to Iran, and the goods are out of his control, no further "voluntary conduct" or "external manifestation of [] will" by the exporter is necessary for the goods to arrive in Iran. *See* RESTATEMENT (SECOND) OF TORTS § 2 cmt. c ("Thus, if the actor, having pointed a pistol at another, pulls the trigger, the act is the pulling of the trigger and not the impingement of the bullet upon the other's person."). The arrival of the goods is a "result" of his "voluntary conduct," not part of the conduct itself, and thus is not a component of the "act" of exportation.

Epsilon's gloss on section 560.204 would also subvert the ordinary meaning of the word "including." That word typically introduces one or more illustrative examples. *See, e.g.*, *Chickasaw Nation v. United States*, 534 U.S. 84, 89 (2001); *Dong v. Smithsonian Inst.*, 125 F.3d 877, 880 (D.C.

14

Cir. 1997); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law* 132-33 (2012). Whatever follows the word "including" is a subset of whatever comes before; any conduct that comes within the "including" clause comes, by definition, within the preceding clause as well. For example, imagine a regulation that reads: "All disruptive activity is prohibited in the park, including the playing of loud music." The word "including" indicates that "playing of loud music" is part of the broader category of "disruptive activity." And if a court (or an agency) adopted a definition of "disruptive activity" that *excluded* "playing of loud music" in many circumstances, that court (or agency) would distort the plain meaning of the regulation.

That principle guides us here, and further illustrates why Epsilon's interpretation of the phrase "to Iran" cannot be correct. Section 560.204 is divided into two clauses. First is the prohibitory clause, which contains the general ban on "exportation . . . to Iran." Second is the "including" clause, which contains the specific prohibition on third-country shipments that is at issue in this case. If we adopted the company's reading of the words "exportation . . . to Iran" in the prohibitory clause, certain conduct would be covered by the including clause, but *not* by the prohibitory clause. Consider a case where an exporter ships goods to a distributor in a third country, knowing that the distributor intends to send those goods on to Iran. In this hypothetical, there is no dispute that the goods entered the third country, but no showing that they actually made it to Iran. On Epsilon's reading, such a case would satisfy the text of the including clause (because the goods arrived in the third country, and the exporter had the necessary mental state), but not the text of the prohibitory clause (because the goods did not arrive in Iran). That interpretation turns the word "including" on its head.

Of course, there are instances where the plain text of an including clause is limited in scope by the preceding clause. *See Massachusetts v. EPA*, 549 U.S. 497, 556-57 (Scalia, J., dissenting). Justice Scalia's dissent in *Massachusetts* cites several examples. But this situation only arises when a particular word or phrase from the first clause is implicitly carried forward into the second clause. For instance, a statute covering "any American automobile, including any truck or minivan" would be most naturally read to mean "any American automobile, including any [*American*] truck or minivan." *See id.* at 557. Similarly, the phrase "a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation" would "not encompass criminal investigations underway in a *domestic* tribunal" because the statutory language implicitly reads "a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation [*in a foreign or international tribunal*]." *See id.* (quoting 28 U.S.C. § 1782(a)).

Here, though, it's not clear what word or phrase would carry forward from the prohibitory clause and limit the scope of the including clause. Perhaps it would be the words "to Iran" (assuming, as Epsilon does, that "to Iran" refers to arrival in Iran, not the sender's intent). That proposition would be complicated by the fact that the words "to Iran" already occur in the including clause: the exporter who ships to a third country must have "knowledge or reason to know" that the goods are intended for reexportation "to Iran." 31 C.F.R. § 560.204(a). Bringing the words "to Iran" from the prohibitory clause into the including clause would also be odd in that the including clause already refers to shipment "to a person in a third country." Should the clause be read to

include shipments "to a person in a third country *to Iran* undertaken with knowledge or reason to know"? That would be an awkward construction, to say the least. In the end, we see no reason to depart in this case from the usual rule that "including" means "for example."

ii

Epsilon contends, in the face of the text, that OFAC has recognized a safe harbor in section 560.204: the "inventory exception." This exception, according to the company, is "well understood in the industry as a negative reading of § 560.204, creating a safe harbor for re-exports to Iran of non-sensitive . . . products so long as the U.S. exporter does not know, or have reason to know, such products are specifically intended for Iran." Appellant Br. 14; *see also* Br. of Amicus Curiae JPM Legal Advisors 3 (describing the inventory exception as a "safe harbor that protects U.S. exporters from running afoul of the regulations where a third party in a non-sanctioned country reexports their goods to Iran *without their knowledge or consent*" (emphasis added)). Thus, Epsilon explains, if it ships goods to a Dubai company that are taken up into the Dubai company's "general inventory," Epsilon cannot be held liable if the Dubai company later ships those same goods to Iran.

Nobody argues that section 560.204 is a strict-liability rule. After all, liability for shipment of goods to a third country explicitly depends on the shipper's knowledge or "reason to know" that the third-country recipient specifically intends to reexport those goods to Iran. *See* 31 C.F.R. § 560.204. Conversely, when an exporter *does* have reason to know that its third-country trading partner specifically intends to reexport the exporter's goods to Iran, the exporter cannot

avoid liability by asserting that the exports passed through the middleman's "general inventory." Appellant Br. 14. The regulation does not provide support for Epsilon's proposed freestanding exception. Nor does the 2002 OFAC guidance document on which Epsilon and *amicus* rely. The guidance document merely restates section 560.204's prohibition and "reason to know" standard, and is not framed as an "exception."[6] *See* OFFICE OF FOREIGN ASSETS CONTROL, 020722-IR-01, GUIDANCE ON TRANSSHIPMENTS TO IRAN (2002) [hereinafter Transshipments Guidance]. Epsilon thus was properly found liable for violating section 560.204 if it had reason to know that its shipments to Asra were specifically intended for reexport to Iran, regardless of whether Asra treated those shipments as "general inventory."

---

[6] "It is important to note that the prohibited sales to Iran through a non-U.S. person in a third country are not limited to those situations where the seller has explicit knowledge that the goods were specifically intended for Iran, but includes those situations where the seller had reason to know that the goods were specifically intended for Iran, including when the third party deals exclusively or predominately with Iran or the Government of Iran." OFFICE OF FOREIGN ASSETS CONTROL, 020722-IR-01, GUIDANCE ON TRANSSHIPMENTS TO IRAN 2 (2002).

We do not decide whether "knowledge that a customer deals *predominantly* with Iran is, standing alone, a basis for finding" a violation of section 560.204. *See* Br. of Amicus Curiae JPM Legal Advisors 8 (emphasis added). As we discuss below, the record supports a finding that, when the first thirty-four shipments were sent, Epsilon had reason to know that Asra dealt *exclusively* with Iran.

iii

Our dissenting colleague argues that OFAC failed in its duty of reasoned decisionmaking because the agency's Penalty Notice was ambiguous. One sentence in that Notice reads: "Multiple facts tend to show that the goods exported to Asra *were sent to Iran* and that Epsilon knew or had reason to know that the goods were intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran." A.A. 198 (emphasis added). In the dissent's view, the "goods . . . were sent to Iran" language suggests a finding that the goods *did* arrive in Iran, and thus indicates that OFAC was trying to avoid deciding whether the actual arrival of goods in Iran is necessary for a section 560.204 violation. *But see* discussion *supra* Section II.A.i (explaining that the phrase "to Iran" more naturally refers to the sender's intent, not the actual arrival of goods in Iran). The dissent contends that this ambiguity requires remand of all liability findings, but we disagree.

Under the APA's deferential standard of review, we will uphold an agency decision where "the agency's path may reasonably be discerned," even if the decision is "of less than ideal clarity." *E.g.*, *Casino Airlines, Inc. v. NTSB*, 439 F.3d 715, 717 (D.C. Cir. 2006) (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974)). Here, we can see the path without difficulty. The Prepenalty Notice, the first document that formally laid out OFAC's charges against Epsilon and offered the company an opportunity to respond, set out the basis for the agency's proposed violation findings in a distinct paragraph:

> From on or about August 26, 2008, to on or about May 22, 2012, Epsilon appears to have

violated 31 C.F.R. § 560.204 when it issued 39 invoices for car audio and video equipment, valued at $3,407,491, which was shipped to Asra, a company with offices in Tehran, Iran, and Dubai, U.A.E., that reexports most, if not all, of its products to Iran. Epsilon knew or had reason to know that such goods were intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran.

Prepenalty Notice 1, A.A. 185. Like an indictment, this paragraph sets out the elements of a section 560.204 violation as the agency understood them, and makes no mention of the actual arrival of goods in Iran. The Prepenalty Notice based its allegation that Epsilon violated section 560.204 on just two premises: first, Epsilon shipped goods to a company "that reexports most, if not all, of its products to Iran" and second, Epsilon "knew or had reason to know" about Asra's Iranian exports. *See id.* Far from "straddling the issue," *see* Partial Dissent at 3, the Prepenalty Notice clearly indicates that in the agency's view, no showing that Epsilon's goods had arrived in Iran was necessary for a section 560.204 violation finding.[7] And because we can see exactly how the agency reasoned, a remand for clarification of that reasoning would serve no purpose. *Cf. PDK Labs., Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) ("If the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration.").

---

[7] If, as our colleague suggests, OFAC was trying to avoid the need to prove that the goods actually arrived in Iran, it is unclear why the agency would deliberately cultivate ambiguity on the matter, instead of straightforwardly maintaining that such proof was not required.

The dissent points out that "we review final agency actions, not preliminary complaints." Partial Dissent at 4. That is true, of course, but not the issue here. Final agency action is usually a prerequisite to our review, but once an agency's action is final and properly before us, we review the entire administrative record. *See* 5 U.S.C. § 706(2) (providing that a court "shall review the whole record" when determining whether an agency's action was arbitrary or capricious); *Camp v. Pitts*, 411 U.S. 138, 142-43 (1973). An agency action need not stand or fall on the last document in the record; if the record as a whole satisfies the APA's requirements, remand "would be pointless." *See Olivares v. TSA*, 819 F.3d 454, 458-59 (D.C. Cir. 2016); *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 738 (D.C. Cir. 2001). The *Chenery* rule against appellate courts' post-hoc justification of agency action operates on the same principle. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which *the record* discloses that its action was based." (emphasis added)); *Tourus Records*, 259 F.3d at 738. Any ambiguity that might exist in the Penalty Notice, taken in isolation, disappears on consideration of the record as a whole, and of the Prepenalty Notice in particular.

## B

We have explained that an exporter may be found liable under section 560.204 if it ships goods from the United States to a third country, with reason to know that those goods are specifically intended for reexport to Iran, even if the goods never arrive in Iran. OFAC found that Epsilon made thirty-nine such shipments, in each case with the requisite reason to know. We now consider whether the agency's determinations were arbitrary and capricious. This case turns on OFAC's

factual determination that Epsilon's conduct contravened section 560.204, and so the central question in the arbitrary-and-capricious analysis is whether substantial evidence supported that determination. *See Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 604 (D.C. Cir. 2007).

The APA's substantial evidence standard "requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence." *Town of Barnstable v. FAA*, 740 F.3d 681, 687 (D.C. Cir. 2014) (quoting *Fla. Gas Transmission Co. v. FERC*, 604 F.3d 636, 645 (D.C. Cir. 2010)). If that threshold is met, we must uphold the agency's judgment regarding the relevant facts, even if we think the "evidence tends to weigh against the agency's finding." *See United Steel Workers*, 707 F.3d at 325. However, we cannot examine the agency's proffered evidence in isolation; we must also consider "whatever in the record fairly detracts from its weight." *Town of Barnstable*, 740 F.3d at 687 (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

We begin our exploration of the facts on the parties' common ground: Epsilon sent thirty-nine shipments of car accessories from the United States to Asra International, and those accessories arrived in Dubai. The only disputed question, in light of our textual analysis above, is whether Epsilon knew, or had reason to know, that Asra International specifically intended to reexport those shipments to Iran. OFAC's guidance explains that "reason to know" can be established "through a variety of circumstantial evidence," including "course of dealing, general knowledge of the industry or customer preferences, working relationships between the parties, or other criteria far too numerous to

enumerate."[8] Transshipments Guidance at 2. We consider the thirty-nine shipments in two groups: the thirty-four shipments sent between 2008 and 2011, and the five shipments sent in 2012. We conclude that OFAC's findings regarding the first group (the 2008-2011 shipments) were adequately justified, but the agency's findings regarding the latter group (the 2012 shipments) were not.

i

Record evidence tends to show that Asra International distributed exclusively in Iran as late as December 2011. Specifically, Asra International's English-language website presented Asra International ("Dubai Asra") as an affiliate of the Asra Electronic Trading Company of Tehran ("Tehran Asra").[9] The website's "Contact Us" page, under the heading "Asra International Corporation L.L.C.," listed only two addresses: one for Asra International Corporation in Dubai, United Arab Emirates, and one for Asra Electronic Trading Company in Tehran, Iran. The same website's "About Us" page, again under the "Asra International Corporation" heading, announced that "Asra Trading Company revels in its 10 long years of experience on Iran's car audio & video market," having established "the broadest car audio & video systems distribution and sales network in Iran, supported by 150 of Iran's most reputable sales agents in different cities." A.A. 85. The marketing copy made several references to

---

[8] Epsilon does not challenge this definition. *See* Appellant Br. 19.

[9] OFAC captured screenshots of the website as it appeared in December 2011. These appear in the administrative record. Nothing in the record suggests that the website's content differed at any relevant time.

Asra's success in "the country," implying that the company served only a single country, Iran; indeed, no other countries were mentioned on this page. *See id.* Finally, the website's "Dealers" tab displayed a long list of sales agents, all located in Iran. OFAC could reasonably infer from this website that Dubai Asra distributed only in Iran, by reexporting goods to Tehran Asra, which then transported those goods to dealers throughout the country.

Epsilon had reason to know these facts, which were available on Asra's public, English-language website. There is also direct evidence that Epsilon had actual knowledge of Asra's website and its contents. Specifically, Epsilon copied images found there to its own website, displaying them in a photo gallery labeled "Iran" as recently as 2012.[10] Thus, in addition to demonstrating Epsilon's awareness of Asra's website, these photos suggest that Epsilon actually knew of Dubai Asra's distribution in Iran. Further evidence that Epsilon knew of Dubai Asra and Tehran Asra's connection came in the form of a 2008 freight manifest, recording a

---

[10] OFAC retrieved earlier versions of Epsilon's website from the Internet Archive, a database of archived webpages. *See United States ex rel. Oliver v. Philip Morris USA, Inc.*, 101 F. Supp. 3d 111, 121-23 (D.D.C. 2015) (confirming reliability of Internet Archive evidence, and citing cases), *aff'd*, 826 F.3d 466 (D.C. Cir. 2016). The Internet Archive recorded the existence of this photo gallery nineteen times between 2007 and 2012. It could be accessed from the Epsilon website's "International Gallery" page (which displayed an array of national flags, and invited visitors to click on a flag "to view that Country's Soundstream Team," A.A. 161) by clicking on an Iranian flag labeled "Iran." Epsilon blames the Iranian flag's presence on a third-party web developer, whom Epsilon had instructed to create the appearance of a "widespread global presence," but does not explain the photo gallery. A.A. 194.

shipment from Epsilon's address directly to Tehran Asra's address.

Because nothing in the record suggests that Asra International made sales anywhere other than Iran before 2012, Epsilon focuses on rebutting the inference that Dubai Asra and Tehran Asra are affiliates. The company offers a letter from a Dubai Asra manager, alleging that Tehran Asra is a separate company that is solely responsible for the website and pirated Dubai Asra's trademarks.[11] But the agency was under no obligation to consider this letter, which was not submitted to OFAC and was not part of the agency record. Epsilon offers no reason for not including the letter, which was dated May 16, 2014, in its response to the Prepenalty Notice, which the company submitted on June 6, 2014. *See, e.g.*, *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) (refusing to consider extra-record evidence absent a showing of "gross procedural deficiencies"). We also note that Epsilon conceded, before the district court, that Dubai Asra is owned by Iranian nationals. *See* Epsilon Mot. Summ. J. 2 n.2.

The information available to Epsilon indicated that everything Dubai Asra purchased before 2012 was sent to Iran. On the record before us, OFAC surely had much "more

---

[11] Epsilon also submitted in the district court an affidavit from a researcher in the Dubai office of the professional-services firm Ernst & Young. The researcher found that Dubai Asra is indeed incorporated in Dubai and "not legally a branch office of any other entity in . . . the U.A.E., or elsewhere." A.A. 200. This affidavit, which was prepared in anticipation of litigation at the request of Epsilon's current counsel, was not part of the administrative record, and so we decline to consider it. *See CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014).

than a scintilla" of evidence, *Town of Barnstable*, 740 F.3d at 687, to support its finding that Epsilon's first thirty-four shipments to Dubai Asra violated section 560.204.

ii

We cannot say the same, however, for the final five shipments. Although a court applying the APA's arbitrary-and-capricious standard "is not to substitute its judgment for that of the agency," *State Farm*, 463 U.S. at 43, the agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *IARA*, 477 F.3d at 732 (quoting *State Farm*, 463 U.S. at 43). Certain evidence in the record indicated that Epsilon did not have reason to know its last five shipments were intended for reexport to Iran. OFAC failed to explain adequately why it discounted that evidence. We do not hold that OFAC *could not have* imposed liability for the last five shipments. That is, we do not opine on whether the record contained substantial evidence supporting a determination of liability for these shipments. *See State Farm*, 463 U.S. at 52. We hold instead that the agency did not explain why its conclusion about the first thirty-four shipments held for the last five as well, in light of the countervailing evidence presented. *See Lakeland Bus Lines, Inc. v. NLRB*, 347 F.3d 955, 962 (D.C. Cir. 2003). In other words, the agency failed to "exercise[] its judgment in a reasoned way." *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 652 (D.C. Cir. 2016) (per curiam).

The countervailing evidence in question consists of several email conversations between Epsilon's sales team and Dubai Asra manager Shahriar Hashemi. These emails covered the period between September 2011 and July 2012, the time

frame when the last five shipments were sent. Epsilon explained that these emails "contemplate[d] [Epsilon] products being sold out of the Asra store in Dubai." A.A. 132. The emails' content seems to bear out Epsilon's characterization. The emails tend to show that Hashemi planned to open a store in Dubai, styled "Actel Trading" but operating under "Asra's flag." A.A. 118. In one conversation, Hashemi expressed concern about a competing retailer selling Epsilon products in Dubai. An Epsilon co-owner reassured him, "We are not selling to anyone in Dubai. It is all yours." A.A. 119. In other emails, Hashemi referred to his "showroom," A.A. 122, and fretted that he would have "nothing to display" to prospective customers from Central Asia, Africa, and Jordan, A.A. 109. The emails appear to connect the final five shipments to this retail store: each shipment has a contemporaneous email chain that implies the shipment was meant for Hashemi's own business. Several refer explicitly to market conditions in Dubai. Epsilon, reading Hashemi's correspondence, might well have believed these five shipments were intended for a Dubai retail store, which suggests that it did not have reason to know those shipments were specifically intended for reexport to Iran.

Government counsel explained at oral argument that OFAC did not consider the emails credible evidence. We can infer as much from the agency's liability finding. But we lack an explanation, from the record, of *why* they are not credible, and why they do not counsel against liability for the final five shipments. The Prepenalty Notice and Penalty Notice do not mention the emails at all, and instead treat the thirty-nine violations as a unit, as though the same set of evidence applied to each one. The agency did include a limited discussion of the emails in an internal OFAC memorandum, circulated a month before the Prepenalty Notice issued. But

even this memo does not set forth a reasoned basis for rejecting the email evidence.

The memo occasionally approaches the necessary explanation, but in each case falls short. First, the memo notes that every email in the record was sent *after* Epsilon received OFAC's first administrative subpoena. At least two inferences could be drawn from that fact. Perhaps Epsilon and Asra concocted the emails to cover up Asra's continued exports to Iran (and Epsilon's knowledge thereof) in the face of OFAC scrutiny. Or perhaps Epsilon read and understood OFAC's January 2012 cautionary letter, and continued exporting to Asra only because it honestly believed its new shipments were meant for Dubai retail. Nowhere in the administrative record does OFAC state any reason for choosing one inference over the other.

Second, the memo mentions that Hashemi's Dubai retail store opened in April 2012, after all but two of the last five shipments had already been dispatched. The relevant question, though, is not whether the goods in the last five shipments were actually sold in the store, but whether Epsilon had reason to know that those last five shipments were intended for Iran. The store's opening date does not rebut evidence that Epsilon believed its goods were slated for eventual sale there. Third, the memo notes that the Dubai store was named Actel Trading but that the last five shipments, like the first thirty-four, were addressed to Asra, not Actel. From these facts, the memo suggests that the last five shipments could not have been intended for retail sale in Dubai. But the memo also observes that Actel appears to be "a subsidiary or affiliate acting on behalf of Asra." Thus, the fact that the shipments were addressed to Asra does not contradict the theory that they were intended for Actel. We

also note the low value of the last five shipments, two of which were worth just over one hundred dollars apiece. At the time those shipments were sent, Epsilon knew its dealings with Asra were under OFAC investigation. OFAC did not explain why Epsilon would knowingly risk fines of up to $250,000 per shipment in return for such a small reward.

In cases like this one, our doctrine offers two principles that pull in opposing directions. We must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *State Farm*, 463 U.S. at 43 (quoting *Bowman Transp.*, 419 U.S. at 286), but we "may not supply a reasoned basis for the agency's action that the agency itself has not given," *id.* (quoting *Chenery*, 332 U.S. at 196). Though the question is close, we hold that OFAC failed to offer a sufficient explanation for why it did not credit the email evidence. Because OFAC failed to justify its conclusion that Epsilon should be held liable for the last five shipments as well as the first thirty-four, the final five liability determinations were arbitrary and capricious.

C

In addition to challenging its liability, Epsilon contends that the *size* of the penalty imposed violates both the Administrative Procedure Act and the Eighth Amendment. We have held that the imposition of liability for the last five shipments was arbitrary and capricious, and so we do not reach Epsilon's challenge to the monetary penalty for those five shipments. The question remains whether the penalty for the first thirty-four shipments is severable from the penalty for the last five, which would allow us to address the lawfulness of the former even after invalidating the latter. *Cf. United States v. Lyons*, 706 F.2d 321, 335 n.25 (D.C. Cir.

1983) (explaining, in the criminal context, that when we "cannot ascertain whether the District Court's sentence on a valid conviction was influenced by a conviction on a separate count that is later overturned on appeal, the proper course is to remand so that the District Court may reconsider the sentence imposed").

Severability of an agency order "depends on the issuing agency's intent. Where there is substantial doubt that the agency would have adopted the same disposition regarding the unchallenged portion if the challenged portion were subtracted, partial affirmance is improper." *North Carolina v. FERC*, 730 F.2d 790, 795-96 (D.C. Cir. 1984). Epsilon has challenged both portions of the penalty calculation, but we are still faced with a severability issue: our liability disposition has removed the basis for one portion of Epsilon's penalty, but not the other.[12] Because the two segments of the penalty calculation are "intertwined," *see Davis Cty. Solid Waste Mgmt. v. EPA*, 108 F.3d 1454, 1459 (D.C. Cir. 1997) (quoting *Tele. & Data Sys., Inc. v. FCC*, 19 F.3d 42, 50 (D.C. Cir. 1994)), our decision on liability requires us to remand the penalty calculation, in its entirety, to OFAC.

To explain why severance is not an option here, we briefly review OFAC's process for calculating civil penalties, which is set out in Appendix A to 31 C.F.R. pt. 501. The agency begins by determining the "base penalty" for each

---

[12] Neither party's briefing or argument addressed the question of severability. However, our disposition of the liability question requires us to consider the issue, where the alternative is "usurp[ation] [of] an administrative function," namely, the balancing of policy considerations needed for a penalty calculation. *See Fed. Power Comm'n v. Idaho Power Co.*, 344 U.S. 17, 20 (1952).

violation, which depends on three variables: the value of the shipment, whether the violation was "egregious," and whether the company voluntarily disclosed the violation. 31 C.F.R. pt. 501, App. A, ¶ V(B)(2)(a).[13] OFAC treated the thirty-four violations that predated its January 2012 cautionary letter as non-egregious, and the five violations that postdated the letter as egregious. Applying the penalty framework to these facts produced a base penalty of $2,823,000 for the thirty-four non-egregious violations, and a base penalty of $1,250,000 for the five egregious violations.

After setting the base penalty, the agency can depart upward or downward by applying the aggravating and mitigating factors listed in the guidelines. *Id.* ¶¶ V(B)(2)(b), III. OFAC did not apply aggravating and mitigating factors to each individual violation, but instead applied the same set of factors to all thirty-nine alleged violations: seven aggravating factors, and three mitigating factors. The most important cited aggravating factor, for our purposes, was that "[f]ive of Epsilon's shipments to Asra occurred after Epsilon . . .

---

[13] Violations in the non-egregious, not-voluntarily-disclosed category are penalized by the "applicable schedule amount." *See* 31 C.F.R. pt. 501, App. A, ¶ V(B)(2)(a)(ii). The "applicable schedule amount" is $10,000 for a shipment valued between $1,000 and $10,000; $25,000 for a shipment valued between $10,000 and $25,000; and so on in like fashion, up to the statutory maximum. *See id.* ¶ I(B). A case will be deemed "egregious" when consideration of the relevant aggravating factors shows it to be "a particularly serious violation of the law calling for a strong enforcement response." *See id.* ¶ V(B)(1). For violations that are egregious and not voluntarily disclosed, OFAC will apply the statutory maximum penalty: $250,000 or twice the value of the offending transaction, whichever is greater. *See id.* ¶ V(B)(a)(iv); 50 U.S.C. § 1705(b).

received a cautionary letter from OFAC for an attempt to send goods directly to Iran." A.A. 187. We have held that the imposition of liability for those five shipments was arbitrary and capricious, and so removed, pending remand, the factual basis for this aggravating factor. This in turn calls into question the penalty for *all* thirty-nine shipments, because this aggravating factor was applied to all of them.[14] OFAC might respond that it applied this aggravating factor only to the last five shipments, but that cannot be the case. The agency had already set the base penalty for those shipments at the statutory maximum, and thus could not have increased the penalty by applying any aggravating factors. If OFAC in fact gave weight to this aggravating factor, it must have done so with respect to the first thirty-four shipments.

We thus have "substantial doubt" that OFAC would have imposed the same penalty for the first thirty-four shipments in the absence of its liability finding for the last five shipments. The penalty for the earlier shipments depended in part on two aggravating factors which themselves depended on the liability finding for the later shipments. Because the agency has primary responsibility for calculating penalties, we will not speculate as to what penalty amount it would set under a different balance of aggravating and mitigating factors. We will leave that judgment to OFAC. *Cf. Nat'l Ass'n of Mfrs. v. NLRB*, 717 F.3d 947, 963 (D.C. Cir. 2013) (noting that a court that is too quick to sever and affirm part of an agency's decision is "performing a function left to the agency"), *overruled on other grounds by Am. Meat Inst. v. U.S. Dep't of*

---

[14] Similarly, OFAC found the fact that "Epsilon exported goods to Asra valued at $3,407,491" to be an aggravating factor. *Id.* Our invalidation of the final five liability findings potentially reduces this number (albeit by a small amount: $35,629), and calls this aggravating factor into doubt as well.

*Agric.*, 760 F.3d 18 (D.C. Cir. 2014) (en banc); *see also Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("[I]f the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."). On remand, whether or not the agency reaffirms the liability findings for the last five shipments, it should reconsider the entire penalty calculation.

Our disposition means that we will not decide whether OFAC's calculation of Epsilon's penalty was arbitrary and capricious. Nor will we reach Epsilon's Eighth Amendment challenge to the penalty amount. Analysis of those questions must await OFAC's response to our decision today.

D

One constitutional argument remains to be considered. "No person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. As noted above, Asra International's website, and the 2008 DHL receipt showing a shipment from Epsilon's address to Tehran, were two important pieces of evidence underlying OFAC's conclusion that Epsilon violated the Iran sanctions regulations. Epsilon argues that it did not learn that OFAC would rely on this evidence until it received the Penalty Notice. The company claims OFAC deprived it of a meaningful opportunity to rebut the Asra website evidence or the shipping receipt, in violation of the Fifth Amendment's Due Process Clause. *See People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 613 F.3d 220, 227 (D.C. Cir. 2010).

However, Epsilon has not carried its burden to demonstrate that it was prejudiced by this alleged error. *See Chai v. Dep't of State*, 466 F.3d 125, 132 (D.C. Cir. 2006) (recognizing that a procedural due process violation, in an administrative adjudication, may be harmless in light of "the particular circumstances" of the case); *see also Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."). Epsilon explained that it would have submitted two additional pieces of evidence to OFAC if it had known the agency planned to rely on Asra's website and on the DHL shipping receipt. First, Epsilon would have introduced a distribution agreement between Epsilon and Asra, entered into on February 1, 2012, which authorized Asra "to sell only to countries which USA can legally distribute [*sic*]." A.A. 95. Second, the company would have provided copies of two letters in which Shahriar Hashemi, the Dubai Asra manager, denied any affiliation between Dubai Asra and Tehran Asra.

Both of these pieces of evidence would have been relevant and responsive to the Prepenalty Notice, and Epsilon fails to explain why it did not include them with its response at that time. The Prepenalty Notice expressly alleged an affiliation between the two Asra entities, Asra International (Dubai Asra) and Asra Electronic (Tehran Asra). *See* A.A. 185 (describing "apparent violations . . . involv[ing] the exportation of goods to Asra International Corporation LLC . . . also doing business as Asra Electronic Trading Co."). The Notice also asserted that Asra "reexports most, if not all, of its products to Iran." A.A. 185. Epsilon was thus on notice that OFAC would seek to prove a connection between Dubai Asra and Tehran Asra, and to prove that Asra reexported to Iran. The two pieces of evidence Epsilon cites

could have bolstered its defense by rebutting those allegations. Neither item is probative only as a response to Asra's website or to the 2008 DHL shipment. Instead, both address OFAC's overarching contention that Dubai Asra did business in Iran. Epsilon has thus not established any causal connection between the alleged due-process error (OFAC's failure to give notice that it would rely on the Asra website and the DHL shipment) and the alleged prejudice: Epsilon's decision not to submit two pieces of potentially exculpatory evidence that the company already had in its possession and knew would be responsive to OFAC's theory of liability. Epsilon's failure to present all of its available evidence to OFAC may be puzzling but cannot be attributed to a lack of notice regarding Asra's website or the DHL receipt.

## III

The order of the district court granting the government defendants' motion for summary judgment is affirmed in part and reversed in part. The order is affirmed as to OFAC's determination that Epsilon's thirty-four shipments to Asra International between August 2008 and March 2011 violated section 560.204 of the Iranian Transactions and Sanctions Regulations. The order is reversed as to OFAC's determination that Epsilon's five shipments to Asra International in 2012 violated the same regulation. The case is remanded to the district court, with instructions to remand the matter to OFAC for further consideration of the five alleged 2012 violations, and of the total monetary penalty imposed for all liability findings, in a manner consistent with this opinion.

*So ordered.*

SILBERMAN, *Senior Circuit Judge, concurring* in part and *dissenting* in part: I agree with my colleagues that it was arbitrary and capricious for OFAC to impose liability on Epsilon Electronics for the five shipments that were sent in 2012. Maj. Op. at 22, 25. But I would go further in ordering a remand. OFAC has exacted a penalty based on a confusing, indeed mystifying, decision.

We are reviewing an informal adjudication of OFAC (referred to as a penalty notice) that imposed a large fine on appellant. OFAC sent appellant a pre-penalty notice—in the nature of a complaint—*alleging* that appellant violated a regulation restricting trade with Iran.[1] The complaint asserted that appellant had sent car audio and video equipment to a company, Asra, in Dubai, which exported "most, if not all, of its products to Iran. [Therefore] Epsilon knew or had reason to know that such goods were intended specifically for supply, transhipment, or reexportation, directly or indirectly, to Iran."

Accordingly, the complaint suggested that only appellant's intent was relevant to its liability, whether or not the goods ever actually arrived in Iran. But appellant, apparently reading the regulation as did most exporters according to amicus, assumed there was no violation unless there was evidence that the goods arrived in Iran. Appellant pointed out in a response to the pre-penalty notice that there was no evidence that any of the audio and video equipment actually arrived in Iran.

So the proper interpretation of the regulation was put squarely in issue before OFAC.

To review, the regulation states:

---

[1] OFAC's regulations describe a pre-penalty notice as containing allegations. 31 C.F.R. § 560.703(b).

§ 560.204 Prohibited exportation, reexportation, sale, or supply of goods, technology, or services to Iran.

Except as otherwise authorized pursuant to this part, and notwithstanding any contract entered into or any license or permit granted prior to May 7, 1995, the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services *to Iran* or the Government of Iran is prohibited, *including* the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:

(a) Such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran; or

. . .

31 C.F.R. § 560.204 (emphasis added).

The government's brief relies on the including clause as establishing the basis for the violation. Appellant responded that the including clause should not be read as providing a separate grounds for violation; it is only an illustration of the broader ban which still requires a showing that the goods arrived in Iran.

Paradoxically, the majority does not rely primarily on the including clause. Actually, its discussion of the clause at page 17 appears to be exactly opposite to the government's, which, I suppose, makes obvious that the including clause is ambiguous as to whether it sets forth a separate ground for violation. In any

event, including clauses are notoriously ambiguous. *See, e.g.*, *American Surety Co. of N.Y. v. Marotta*, 287 U.S. 513, 517 (1933); *Ohio v. EPA*, 997 F.2d 1520, 1543 (D.C. Cir. 1993); *Adams v. Dole*, 927 F.2d 771, 775 (4th Cir. 1991). That courts may have settled on a default rule *as a means of resolving that ambiguity* when required to do so themselves is irrelevant.

Instead the majority assumes, along with appellant, that the key phrase is "export . . . to Iran" (it carries over to the including clause). Does that phrase mean the goods just have to be sent by the first sender towards Iran or must there be a showing that the goods arrived in Iran? Unfortunately OFAC's decision never discusses the proper interpretation of the regulation; it conducts no textual exegesis. (Even the government's brief does not make a specific textual argument except to assert that the words after "including" create an *additional* overriding prohibition—implying, contrary to the majority's view, ironically, that without the including clause, the words "to Iran" would not be adequate to make out the government's case.)

Moreover—and here is the core of the reason I think we must remand—in response to appellant's defense that there is no evidence the goods arrived in Iran, OFAC's decision is quite confusing. It stated "multiple facts *tend to show* that the goods exported to Asra *were sent to Iran*." (emphasis added). In other words, the agency fudged the answer to the crucial question.

It appears that the agency's draftsman, aware of the ambiguity in the regulation, was straddling the issue of whether or not the agency had to prove that the goods arrived in Iran. (It reminds me of the famous Yogi Berraism, "if you come to a fork in the road, take it.") That approach simply is not consistent with the obligation under the APA to engage in reasoned

decision-making.  *See generally Allentown Mack Sales & Service, Inc. v. NLRB*, 522 U.S. 359, 374-75 (1998).

The majority ignores this ambiguous language in the agency's decision; it focuses on the complaint and the complaint's implicit  interpretation of the regulation.  But even were we to assume the complaint's allegations were crystal clear, that is quite irrelevant as to the clarity of the agency's decision.   After all, we review final agency actions, not preliminary complaints.  I would have thought that was black letter administrative law.

Perhaps recognizing the agency's failure to explicitly interpret the regulation as applied to this case, the government seeks deference to the interpretation it advances in litigation, which I've pointed out is rather skimpy.  The majority decides, however, that deference is not necessary and spends pages and pages setting forth its "reading" of the phrase "to Iran," leading to its conclusion the agency's decision can be upheld.

I hardly know where to start.  First, the majority never denies that the regulation is ambiguous—still less the adjudication—it simply sets forth its interpretation  of the regulation which favors the government's decision.   But the problem with the majority treating deference as irrelevant is it improperly appears to freeze the agency's interpretation of an ambiguous regulation. *Cf. Perez v. Mortgage Bankers Ass'n*, — U.S. —, 135 S. Ct. 1199 (2015). Even if one were to agree with the majority that its interpretation  of the regulation were the better one, I have little doubt that another OFAC leadership could interpret the language differently.  Suppose, for instance, an exporter in Omaha sent goods to Iran to be consolidated with a brother-in-law's shipment in Chicago.  The brother-in-law, blessed with legal advice, determined not to send the goods. Would the Omaha shipper be in violation of the regulation?

According to the majority, yes, but I certainly could imagine OFAC reasonably coming to another answer.

Second, the majority's lengthy interpretation of the regulation totally ignores another fundamental principle of administrative law going back to *Chenery I*. 318 U.S. 80 (1943). It is not up to a reviewing court to offer explanations for an agency decision not articulated by the agency. If one accepts—and I don't know how it can be denied—that the agency's *decision* is ambiguous as to whether actual evidence exists of appellant's goods arriving in Iran and whether such evidence is necessary, it is hardly open to a reviewing court to "clarify" the agency's decision. The majority asserts it can see the "path" the agency traveled, drawing, in part on the complaint and on government's brief, but that just ignores the confusion in the adjudication which, of course, is the final agency action we are reviewing. We know what the agency's preliminary interpretation of the regulation was, but, after it was contested, we don't know the agency's interpretation in its final decision.

Finally, perhaps the strangest objections the majority raises to a remand to clarify the adjudication's ambiguity are: (1) that appellant was not prejudiced because whether or not the adjudication was ambiguous, the complaint was not; and (2) in any event, appellant never argued that it was separately harmed by the ambiguity in the adjudication. Maj. Op. at 20. The first point assumes that the complaint is somehow transformed into final agency action. It is so contrary to administrative law—indeed all law—I hardly know what to say. The second point is equally bizarre. Of course, appellant wouldn't "specifically" argue that the agency's ambiguity required a remand. It wanted a decision holding the agency adjudication was inconsistent with the regulation. A remand is what a court does when it is not sure how the agency read the regulation and applied it to the facts. No case of ours ever held that a party challenging an

agency's interpretation of a regulation or a statute has to specifically ask for a remand if we conclude the agency's decision is ambiguous.[2]

---

[2] I would have been inclined to reject liability entirely rather than remand had appellant made the argument that imposing a penalty pursuant to an ambiguous regulation is inappropriate if you interpret it for the first time in a penalty proceeding. *See Gates & Fox Co., Inc. v. Occupational Safety and Health Review Comm'n*, 790 F.2d 154, 156 (D.C. Cir. 1986). But as the government pointed out at oral argument, appellant did not take that position.