# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 15, 2020      Decided November 12, 2021

No. 16-1430

TRUCK TRAILER MANUFACTURERS ASSOCIATION, INC.,
PETITIONER

v.

ENVIRONMENTAL PROTECTION AGENCY, ET AL.,
RESPONDENTS

CALIFORNIA AIR RESOURCES BOARD, ET AL.,
INTERVENORS

———

On Petition for Review of an Action of the
United States Environmental Protection Agency and
the National Highway Traffic Safety Administration

———

*Elisabeth S. Theodore* argued the cause for petitioner. With her on the briefs were *S. Zachary Fayne*, *Jonathan S. Martel*, and *Samuel F. Callahan.*

*H. Thomas Byron, III*, Attorney, U.S. Department of Justice, argued the cause for respondents. With him on the brief were *Jeffrey Bossert Clark*, Assistant Attorney General, *Jonathan Brightbill*, Principal Deputy Assistant Attorney General*,* and *Eric G. Hostetler* and *Jennifer L. Utrecht*, Attorneys. *Sue S. Chen,* Attorney, and *Douglas N. Letter*,

General Counsel, U.S. House of Representatives, entered appearances.

*Alice Henderson* argued the cause for respondents-intervenors Public Health and Environmental Organizations. With her on the brief were *Jim Dennison*, *Vickie Patton*, *Peter Zalzal*, *Benjamin Longstreth*, *Peter Huffman*, *Vera Pardee*, *Joanne Spalding*, *Andres Restrepo*, *Susannah Landes Weaver*, *Sean H. Donahue*, *Clare Lakewood*, *Katherine Hoff*, and *Kevin Bundy.*

*Xavier Becerra*, Attorney General, Office of the Attorney General  for the State of California, *Robert W. Byrne*, Senior Assistant Attorney General, *Myung J. Park*, Supervising Deputy Attorney General, *M. Elaine Meckenstock*, *Caitlan McLoon*, and *Ryan R. Hoffman*, Deputy Attorneys General, *William Tong*, Attorney General, Office of the Attorney General for the State of Connecticut, *Matthew I. Levine* and *Scott N. Koschwitz*, Assistant Attorneys General, *Maura Healey*, Attorney General, Office of the Attorney General for the Commonwealth of Massachusetts, *Carol Iancu*, Assistant Attorney General, *Tom Miller*, Attorney General, Office of the Attorney General for the State of Iowa, *Jacob J. Larson*, Assistant Attorney General, *Ellen F. Rosenblum*, Attorney General, Office of the Attorney General for the State of Oregon, *Paul Garrahan*, Attorney-in-Charge, *Peter F. Neronha*, Attorney General, Office of the Attorney General for the State of Rhode Island, *Gregory S. Schultz*, Special Assistant Attorney General, *Bob Ferguson*, Attorney General, Office of the Attorney General for the State of Washington, *Thomas J. Young*, Assistant Attorney General, *Thomas J. Donovan, Jr.*, Attorney General, Office of the Attorney General for the State of Vermont, and *Nicholas F. Persampieri*, Assistant Attorney General, were on the brief for respondents-intervenors California Air Resources Board, et al.  *Kathleen A. Kenealy,*

3

Chief Assistant Attorney General, Office of the Attorney General for the State of California, entered an appearance.

Before: MILLETT, KATSAS*, and WALKER, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WALKER.

Opinion concurring in the judgment in part and dissenting in part filed by *Circuit Judge* Millett.

WALKER, *Circuit Judge*: In 2016, the Environmental Protection Agency issued a rule for trailers pulled by tractors based on a statute enabling the EPA to regulate "motor vehicles." In that same rule, the National Highway Traffic Safety Administration issued fuel efficiency standards for trailers based on a statute enabling NHTSA to regulate "commercial medium-duty or heavy-duty on-highway vehicles."

Trailers, however, have no motor. They are therefore not "motor vehicles." Nor are they "vehicles" when that term is used in the context of a vehicle's fuel economy, since motorless vehicles use no fuel.

We therefore grant the petition and vacate all portions of the rule that apply to trailers.

I.

The most widely recognized "tractor-trailer" combination is what a layperson calls a semitruck. A trailer is the back

---

* Judge Katsas was randomly selected to replace then-Judge Garland, who was a member of the panel at the time the case was submitted.

portion attached to a motorized tractor in the front. Trailers include tanks, car carriers, logging trailers, and platforms. *Greenhouse Gas Emissions and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles—Phase 2*, 81 Fed. Reg. 73,478, 73,640 (Oct. 25, 2016).

In 2016, the EPA and NHTSA jointly created a rule called "Greenhouse Gas Emissions and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles—Phase 2." *Id.* at 73,478. Under that rule, for the first time, those agencies set greenhouse gas emissions and fuel efficiency standards for heavy-duty trailers. The rule requires trailer manufacturers to adopt some combination of fuel-saving technologies, such as side skirts and automatic tire pressure systems.

Truck Trailer Manufacturers Association, Inc. objected to the rule and timely petitioned for review. In 2017, this court granted the Association's motion to stay the EPA's portion of the rule to the extent it applies to trailers. In 2020, we stayed the compliance dates in NHTSA's portion.

## II.

An agency's rule may not exceed the agency's statutory authority. 42 U.S.C. § 7607(d)(9)(C); 5 U.S.C. § 706(2)(C). To understand that authority, we consider the statute's text, structure, and context. We ask "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984). If Congress has, and the agency acted in accordance with the statute, our inquiry ends. *Id.* at 842-43 ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously

expressed intent of Congress.").[1]

## A.  The EPA's Authority

According to the EPA, it can regulate (1) trailers as motor vehicles, 42 U.S.C. § 7521(a)(1), and (2) trailer manufacturers as motor-vehicle manufacturers, *id.* § 7550(1).  We discuss each in turn.

### 1. Motor Vehicles

The EPA primarily relied on § 202(a)(1) of the Clean Air Act for its authority to regulate trailers' effects on greenhouse gas emissions.  *Id.* § 7521(a)(1).  That section requires the EPA to set emissions standards for new motor vehicles and their engines if they emit harmful air pollutants.  It provides:

> **The Administrator shall** by regulation **prescribe** (and from time to time revise) in accordance with the provisions of this section, **standards applicable to the emission of any air pollutant from** any class or classes of **new motor vehicles or new motor vehicle engines**, which in his judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare.  Such standards shall be applicable to such vehicles and engines for their useful life (as determined under subsection (d), relating to

---

[1] The Association argues that the agencies are not entitled to *Chevron* deference because (1) the EPA didn't invoke it, and (2) the agencies are actively reconsidering the rule.  However, we need not decide whether *Chevron* deference applies because, when the relevant terms are read in context, they are unambiguous.

useful life of vehicles for purposes of certification), whether such vehicles and engines are designed as complete systems or incorporate devices to prevent or control such pollution.

*Id.* (emphases added).

The Act defines "motor vehicle" to exclude anything that does not propel itself. *Id.* § 7550(2). For the purposes of § 202, a "**motor vehicle**" is "**any self-propelled vehicle designed for transporting persons or property on a street or highway**." *Id.* (emphases added).

Because trailers are not "self-propelled," they are not motor vehicles under § 202. Therefore, the EPA cannot rely on § 202 to regulate trailers' effects on greenhouse gas emissions.

The EPA and Respondent-Intervenors ask us to focus on the second half of motor vehicle's definition, requiring a motor vehicle to be "designed for transporting persons or property." *Id.* They say "the tractor-trailer as a whole should be considered the pertinent vehicle" because a tractor "cannot accomplish its intended purpose" unless the tractor is pulling the trailer. Respondents' Br. 29.

But tractors can carry people and things without trailers attached. As anyone who has spent any time on a highway knows, they often do. So a tractor without a trailer can still accomplish what it is "designed for." 42 U.S.C. § 7550(2). That makes a self-propelled tractor a "motor vehicle" long before a trailer is ever attached.

The EPA also invites us to focus on the second sentence of § 202(a)(1): "Such standards shall be applicable to such vehicles . . . whether such vehicles . . . are designed as complete systems or incorporate devices to prevent or control such pollution." *Id.* § 7521(a)(1). The EPA says that sentence allows it to regulate significant *components* of the complete vehicle because Congress suggested that the EPA could create standards for vehicles or *portions* of vehicles not "designed as complete systems." *Id.*

But that's not what Congress did. Rather, it created two categories of complete motor vehicles. Category one: motor vehicles with built-in pollution control. Category two: motor vehicles with add-in devices for pollution control. Either way, for both categories, the phrase "such vehicles," in that sentence, refers to "motor vehicles," not components. That takes us back to where we started. Because trailers are not "motor vehicles," no reference to "motor vehicles" — like "such vehicles" — covers trailers.

The EPA's theories, taken to their logical conclusion, mean that the EPA could regulate other non-propelled items attached to a motorized vehicle. For example: rooftop cargo carriers. They are "designed for transporting . . . property." *Id.* § 7550(2). And when they are on a car, they are attached to a motor vehicle. But they are not themselves motor vehicles.[2]

---

[2] The EPA claims that our approach would allow a manufacturer to avoid EPA emissions standards by making an entire car, except for a component that makes the car self-propelled, such as the ignition switch. But under our approach, the EPA can ensure compliance by regulating the assembler of the car — the company that installs the ignition switch — thereby making the vehicle self-propelled. *See id.* §§ 7521(a)(1), 7550(1). With trailers, the problem for the EPA is

Perhaps sensing that it needs to offer a limiting principle, the EPA claims that it can regulate only "significant" vehicle components. Respondents' Br. 34. But that limit is atextual. Even if a trailer is a motor-vehicle component — which we doubt[3] — we cannot endorse a hazy line mentioned nowhere in a statutory provision that allows the EPA to regulate "motor vehicles," not motor-vehicle components.

In addition, the EPA is incorrect that § 202(a)(5), (a)(6), and (k) of the Clean Air Act provide contextual support for its alleged authority under § 202(a)(1) to regulate any component of an entire vehicle — even assuming again that a trailer is a motor-vehicle component. These provisions address fill pipes, onboard vapor recovery systems, and control of evaporative emissions of hydrocarbons. 42 U.S.C. § 7521(a)(5), (a)(6), (k). Even if they allow for regulation of specific vehicle components, § 202(a)(1) doesn't allow for the regulation of all others. Rather, § 202(a)(1) covers self-propelled units, not *components* of self-propelled units. That Congress may have provided separate provisions about specific components reinforces the limited scope of § 202(a)(1) — regulation of motor vehicles designed to transport people or property.

## 2. Motor-Vehicle Manufacturers

According to the EPA and Respondent-Intervenors, the EPA can require trailer manufacturers to abide by the agency's emissions standards because the statute's definition of

---

that before any trailer shows up, there's a vehicle that has already been made self-propelled — the tractor.

[3] We think the trailer is probably more like a rooftop cargo carrier — a mere attachment to a motor vehicle, rather than a component of a motor vehicle.

manufacturers allows for multiple manufacturers of one vehicle. The Act defines "manufacturer" as one "engaged in the manufacturing or assembling of new motor vehicles":

> [A]ny person engaged in the manufacturing or assembling of new motor vehicles, new motor vehicle engines, new nonroad vehicles or new nonroad engines, or importing such vehicles or engines for resale, or who acts for and is under the control of any such person in connection with the distribution of new motor vehicles . . . .

*Id.* § 7550(1).

In making that argument, the EPA and Respondent-Intervenors do not attempt to refute what we've already explained: (a) a motor vehicle, as defined, must be self-propelled; and (b) a trailer, by itself, is not self-propelled. But rather than deducing that a trailer is therefore not a motor vehicle, they say that because a trailer attached to a tractor can be imagined as a "tractor-trailer" (true), a trailer manufacturer is "engaged in the manufacturing" of a motor vehicle (false).

The key problem for the EPA here — as it was in the subsection above — is that a tractor is a motor vehicle *before* it's part of a tractor-trailer. With or without a trailer, the tractor is self-propelled and designed for transporting people or property on the road. Trailers (and trailer manufacturers) are therefore unlike parts of a motor vehicle (and their manufacturers) required for self-propulsion.

To be sure, a "tractor-trailer" combination is self-propelled, in the same sense that a van with a cargo carrier is self-propelled. But again, a tractor is already a motor vehicle, whether or not the trailer is attached. Trailer manufacturers are

thus only "engaged in the manufacturing . . . of new motor vehicles" in the way that rooftop cargo carrier manufacturers would be "engaged in the manufacturing . . . of new motor vehicles" — that is to say, not in a way that follows the definition of manufacturer.[4]

Moreover, because trailers are rarely, if ever, sold together with tractors, various statutory requirements would be impossible for trailer manufacturers to satisfy if the "motor vehicle" were the tractor-trailer combination. For example, a trailer manufacturer could not obtain the necessary certificate of conformity prior to sale, because it could not know to which tractor its trailer would later be attached. *See id.* § 7525(a)(1). Nor could it satisfy the requirement to warrant compliance of the tractor-trailer combination with applicable regulations. *See id.* § 7541(a)(1).

The EPA attempts to distinguish trailers from attachments like rooftop cargo carriers by asserting the authority to regulate only "significant" vehicle components. *Cf. id.* § 7550(9) (referring to a vehicle part or component as something "installed in or on motor vehicles").[5] But as mentioned above, the statute does not distinguish between "significant" and

---

[4] Likewise, we wouldn't, for example, say potters manufacture potted *plants*.

[5] When the EPA says a trailer is a component, we presume it means it's a component "installed in or on motor vehicles," *id.* § 7550(9), not a part *required* to actually complete a "self-propelled vehicle designed for transporting persons or property," *id.* § 7550(2). But if the EPA means the second type, we have already explained why a trailer is not a required segment necessary for a tractor to meet this motor vehicle definition. So a trailer would not be a component in that sense.

"insignificant" components. The EPA cannot save its theory by inventing an atextual limit.

Finally, even if trailer manufacturers make vehicle *components* — again, we doubt it — the Act's definition of "manufacturer" does not include a maker of vehicle *components*. *See id.* § 7550(1). Perhaps that is why Congress defined "motor vehicle or engine *part* manufacturer" separately. *Id.* § 7550(9) (emphasis added). And it might explain why Congress referred to motor vehicle components and component manufacturers elsewhere. *See, e.g., id.* §§ 7541(a)(2), 7542(a).

\* \* \*

The objects of the EPA's § 202 Clean Air Act regulations must be self-propelled. Trailers are not self-propelled. Therefore, the EPA cannot use § 202(a)(1) to set emissions standards for trailers and require trailer manufacturers to comply with them.

### B. NHTSA's Authority

We turn now to the National Highway Traffic Safety Administration's authority. NHTSA relies on the Ten-in-Ten Fuel Economy Act, which was enacted as part of the Energy Independence and Security Act of 2007. 81 Fed. Reg. at 73,519; *see* Pub. L. No. 110-140, 121 Stat. 1492 (2007).

The Ten-in-Ten Fuel Economy Act requires NHTSA, with help from the EPA, to establish "fuel economy standards for" certain vehicles. 49 U.S.C. § 32902(b)(1). It instructs the agencies to examine the "fuel efficiency" for some of those vehicles, determine metrics for their "fuel efficiency," and

make rules to improve their "fuel efficiency." *Id.* § 32902(k)(1)-(2).

Congress's fuel economy statute applies to "passenger automobiles," "non-passenger automobiles," and "work trucks." *Id.* § 32902(b)(1)(A)-(C). No one contends that trailers are covered by those categories.

The statute also applies to "commercial medium-duty or heavy-duty on-highway vehicles." *Id.* § 32902(b)(1)(C); *see also id.* § 32902(k)(2).[6] That is the only type of vehicle the parties discuss here. Congress defined that type of vehicle as "an on-highway vehicle with a gross vehicle weight rating of 10,000 pounds or more." *Id.* § 32901(a)(7). But here, unlike in the Clean Air Act, Congress didn't define "vehicle."

Section 32902(k) subjects "work trucks" and "commercial medium- and heavy-duty on-highway vehicles" to a "fuel efficiency" study and subsequent rulemaking, which includes "implement[ing] appropriate . . . fuel economy standards." *Id.* § 32902(k).[7]

In 2016, NHTSA used that statutory directive to regulate trailers. It claims that the term "vehicles" is ambiguous and

---

[6] Sometimes the statute says "commercial **medium-duty or** heavy-duty" and other times it says "commercial **medium- and** heavy-duty." *Compare id.* § 32902(b)(1)(C) *with id.* § 32902(k)(2) (emphases added). They're the same, and we use both phrases interchangeably.

[7] Congress separately outlined the requirements for fuel economy standards for "passenger automobiles" and "non-passenger automobiles" in § 32902(b)(2), without requiring any fuel efficiency studies. *Compare id.* § 32902(b)(2) *with id.* § 32902(k)(1).

that it reasonably interpreted "commercial medium- and heavy-duty on-highway vehicles" to include trailers. *Id.* We disagree.

If you went to law school in the past sixty years, you may have come across the following question: "A legal rule forbids you to take a vehicle into the public park. Plainly this forbids an automobile, but what about bicycles, roller skates, toy automobiles? What about airplanes?" H.L.A. Hart, *Positivism and the Separation of Law and Morals*, 71 HARV. L. REV. 593, 607 (1958).

That question has been called "the most famous hypothetical in the common law world." Frederick Schauer, *A Critical Guide to Vehicles in the Park*, 83 N.Y.U. L. REV. 1109, 1109 (2008). It shows that the meaning of a word may be broad in the abstract, but unambiguously narrower in context. Is a toy truck a "vehicle"? In the abstract, perhaps. As many dictionaries will show, "vehicle" can, in isolation, be a broad term. *See, e.g.*, *Vehicle*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003) ("a means of carrying or transporting something"). But in the context of a rule excluding vehicles from a park, the term is not quite so expansive: It's safe to say the rule doesn't cover a picnicking child playing with a wooden truck. *See* Antonin Scalia & Bryan A. Garner, *A Note on the Use of Dictionaries*, 16 GREEN BAG 2D 419, 423 (2013) ("Because common words typically have more than one meaning, you must use the context in which a given word appears to determine its aptest, most likely sense.").

In the Energy Independence and Security Act of 2007, as in the hypothetical about a park, the word "vehicle" is undefined. But here, as there, its context prescribes its limits. *See FDA v. Brown & Williamson Tobacco Co.*, 529 U.S. 120, 133 (2000) ("It is a fundamental canon of statutory

construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.") (cleaned up); *Natural Resources Defense Council v. EPA*, 489 F.3d 1364, 1373 (D.C. Cir. 2007) ("absence of a statutory definition does not" make a statutory term ambiguous).

Here, Congress made "fuel economy" — a measure of "miles traveled by an automobile for each gallon of gasoline . . . used," 49 U.S.C. § 32901(a)(11) — a required trait of the vehicles subject to the fuel efficiency improvement program, *see id.* § 32902(k)(1)-(2). In its statutory subsection on "commercial medium- and heavy-duty on-highway vehicles," Congress referred to "fuel economy" three times. *Id.* § 32902(k). [8]   And across § 32902 — which covers those vehicles as well as automobiles and work trucks — it did so thirty-seven times.[9] Of course, quantity isn't everything. But by requiring NHTSA to set fuel economy standards when establishing its fuel efficiency program and then constantly

---

[8] Twice if you don't count its reference to the Ten-in-Ten Fuel Economy Act. *Id.* § 32902(k)(1).

[9] *See id.* § 32902 (title) (once); *id.* § 32902(a) (twice); *id.* § 32902(b)(1) (once); *id.* § 32902(b)(2) (eleven times); *id.* § 32902(b)(3) (three times); *id.* § 32902(b)(4) (once); *id.* § 32902(c) (once); *id.* § 32902(d)(1) (three times); *id.* § 32902(d)(2) (once); *id.* § 32902(e)(2) (twice); *id.* § 32902(f) (three times); *id.* § 32902(g)(1) (once); *id.* § 32902(g)(2) (once); *id.* § 32902(h)(1) (once); *id.* § 32902(h)(3) (once); *id.* § 32902(j)(1) (once); *id.* § 32902(k)(1) (once, in reference to the Ten-in-Ten Fuel Economy Act); *id.* § 32902(k)(2) (once); *id.* § 32902(k)(3) (once).

referring us to fuel economy, Congress put the term "vehicle" in a context limited to machines that *use* fuel.[10]

That limit unambiguously rules out trailers. They are not "commercial medium- and heavy-duty on-highway vehicles" as that term is used in § 32902.[11] That alone is enough to decide this case. But two additional considerations confirm our conclusion.

First, grouped words should be given meanings that are similar in nature. *See Agnew v. Government of the District of Columbia*, 920 F.3d 49, 56 (D.C. Cir. 2019) (a term is "known by the company it keeps"); Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 195-98

---

[10] NHTSA points out that a trailer *affects* the fuel efficiency and fuel economy of a tractor. But so do bike racks, rooftop cargo carriers, and other attachments to vehicles. And not even NHTSA argues that they are vehicles. That said, we agree with the State Intervenors that NHTSA cannot regulate bike racks for a different reason — because bike racks do not have "a gross vehicle weight rating of 10,000 pounds or more." *Id.* § 32901(a)(7).

Moreover, NHTSA has the authority to set only "fuel economy standard[s]" for vehicles, *id.* § 32902(b)(1), and it is unnatural to describe the extent to which one vehicle affects *another* vehicle's fuel economy as itself a "fuel economy standard" for the whole vehicle. So while a trailer may affect the "fuel economy standard" of a tractor, the trailer does not itself have a "fuel economy standard."

[11] We read "on-highway vehicles" as describing vehicles designed for use on a highway. An alternative reading of that phrase — covering the form in which vehicles travel on the highway — is at best a distinction without a difference and at worst a reading that would permit regulation of commercial medium- and heavy-duty vehicles like bulldozers and excavators that can be driven on a highway but are not designed for that purpose.

(2012) (*noscitur a sociis*). In § 32902(b)(1), the purportedly ambiguous term "vehicles" is preceded by three other types of vehicles which all have engines and burn fuel: "passenger automobiles," "non-passenger automobiles," and "work trucks." 49 U.S.C. § 32902(b)(1); *see also Yates v. United States*, 574 U.S. 528, 543 (2015) (plurality opinion) ("a word is given more precise content by the neighboring words with which it is associated") (cleaned up). And lest there be any doubt about the limits of the meaning of "automobile," the statute defines it as "a 4-wheeled vehicle that is propelled by fuel, or by alternative fuel . . . ." *Id.* § 32901(a)(3).

Trailers have no meaningful similarity to passenger and non-passenger automobiles because trailers are not "propelled by fuel, or by alternative fuel." Nor are they like work trucks, which have an engine and burn fuel.

It's true that the definitions of work trucks and commercial vehicles do not say "propelled by fuel," like the definition of "automobile" does. *Compare id.* § 32901(a)(7), (a)(19) *with id.* § 32901(a)(3). But even NHTSA does not deny that trucks use fuel, and in the 2007 Act, Congress at times used "trucks" and "vehicles" synonymously. Specifically, in §§ 107 and 108 of the Act, Congress referred to a "medium-duty and heavy-duty *truck*" instead of a "medium- and heavy-duty on-highway *vehicle*," as it does elsewhere. *See* Pub. L. No. 110-140, §§ 107-08, 121 Stat. at 1504-05.[12]

Since trucks use fuel, and since Congress used "trucks" and "vehicles" synonymously, "vehicles" use fuel as well (in

---

[12] In those two sections, Congress told the Secretary of Transportation and the National Academy of Sciences to "execute an agreement" according to which the academy would make a report analyzing vehicle and truck fuel economy standards. *See id.*

the context of § 32902). And because a trailer does not consume fuel, it's not a vehicle in the context of § 32902.

Second, NHTSA's mistaken reliance on the definition of "motor vehicle" in NHTSA's organic act is the nail in its coffin. *See* 49 U.S.C. § 30102(a)(7). Congress expressly excluded from that definition's application the entire chapter on which NHTSA relies for its authority to regulate trailers.

To see why, consider Part A and Part C of the subtitle that governs NHTSA's authority.

Within Part A, "motor vehicle" is defined as "a vehicle driven or drawn by mechanical power and manufactured primarily for use on public streets, roads, and highways . . . ." *Id.*

You can see why NHTSA and the State Intervenors cite that definition in their briefs. A trailer is "drawn by mechanical power."

But Part A doesn't give NHTSA any authority to regulate trailers. Its purported authority comes from § 32902 in Chapter 329 of Part C. So now consider Part C.

Part C includes the same definition of "motor vehicle" as in Part A. *Id.* § 32101(7). But the introductory phrase to its definitions says: "In this part (**except chapter 329** . . . )—." *Id.* § 32101 (emphasis added). That means that the "drawn by mechanical power" definition of "motor vehicle" applies to all of Part C *except for* Chapter 329 — the chapter with the

provision (§ 32902) that gives NHTSA its purported authority to regulate trailers.[13]

In other words, NHTSA's authority to regulate trailers under § 32902 depends on a definition that by its express terms does not apply to § 32902.[14]

Finally, to the degree NHTSA suggests that a tractor-trailer unit is the relevant vehicle that it can regulate under § 32902, its reasoning is misplaced for the same reason that the EPA's reasoning was misplaced: A tractor is the relevant "vehicle" or "truck" for regulation *before* the trailer is attached. That's because the tractor is a vehicle with fuel economy — "miles traveled" per "gallon of gasoline . . . used." *Id.* § 32901(a)(11).[15]

---

[13] We discuss the phrase "motor vehicle" here only to rebut *NHTSA's* and the *State Intervenors'* use of the phrase. Respondents' Br. 17 (referring to the definition of "motor vehicle" in § 30102(a)(7)); State Intervenors' Br. 8 (same).

[14] Moreover, the introductory phrase to the definition section of Part A also provides some insight into how far the "drawn by mechanical power" definition stretches there. In § 30102, the section begins with "[i]n this chapter." So the definition from § 30102(a)(7) is meant to apply to Chapter 301 — the chapter that § 30102 is in — which is not the same chapter that § 32902 is in — Chapter 329. And there is good reason why "motor vehicle" would be defined differently in Chapter 301 than in Chapter 329. Chapter 301 concerns safety, and trailers have safety features such as lights, turn signals, and reflectors. But trailers do not have fuel economy, which is the focus of Chapter 329. "In this chapter" is thus further evidence that the § 30102(a)(7) definition should not apply to a "vehicle" in § 32902.

[15] What's more, § 32901 defines "commercial medium- and heavy-duty on-highway vehicles" by reference to a vehicle's "gross vehicle weight rating," 49 U.S.C. § 32901(a)(7), a common phrase used in

And, as with the EPA's arguments, there is no principled limit to NHTSA's theory. Under it, NHTSA could regulate bike racks, rooftop cargo carriers, or anything similar that would impact the fuel efficiency of a vehicle.[16] To be sure, NHTSA can regulate *tractors* based on the *trailers* they pull, as can the EPA. But neither NHTSA nor the EPA can regulate trailers themselves.

\* \* \*

Because a trailer uses no fuel, it doesn't have fuel economy. And in the statutory context of § 32902, nothing is a vehicle unless it has fuel economy — a measure of miles traveled per gallon of fuel used.

NHTSA therefore lacked the authority to regulate trailers.

---

NHTSA parlance to describe the "maximum load that can be carried by a vehicle, including the weight of the vehicle itself," 81 Fed. Reg. at 73,485 n.26. But NHTSA regulations separately refer to the gross *combined* weight rating, defined as the "maximum load that the vehicle can haul, including the weight of a loaded trailer and the vehicle itself." *Id.* If "commercial medium- and heavy-duty on-highway vehicles" were meant to include tractor-trailers, it would make little sense to define that phrase by a gross vehicle weight rating, as opposed to a gross combined weight rating.

[16] Under that theory, the weight requirement in the definition of "commercial medium- and heavy-duty on-highway vehicle" would not prevent a bike rack from being regulated because it would allow NHTSA to regulate any attachment that results in a gross vehicle weight rating of 10,000 pounds or more. *Id.* § 32901(a)(7).

20

III.

The Final Rule relies on statutes that do not give the EPA and NHTSA authority to regulate trailers. We grant the petition for review and vacate all portions of the rule that apply to trailers.

MILLETT, *Circuit Judge*, concurring in the judgment in part and dissenting in part: From the Pacific Coast Highway to Route 66 to the Pennsylvania Turnpike, eighteen-wheelers, also known as semitrucks, have long been a familiar presence on America's highways. While these tractor-trailers play a key role in transporting goods from one coast to the other, they also consume fuel at high rates and emit large amounts of carbon dioxide and other greenhouse gases. Recognizing the effect of these heavy-duty vehicles on climate change, President Obama directed the National Highway Traffic Safety Administration ("NHTSA") and the Environmental Protection Agency ("EPA") to issue fuel efficiency and greenhouse gas emission standards for tractor-trailers' operations. *See* THE WHITE HOUSE, IMPROVING THE FUEL EFFICIENCY OF AMERICAN TRUCKS—BOLSTERING ENERGY SECURITY, CUTTING CARBON POLLUTION, SAVING MONEY AND SUPPORTING MANUFACTURING INNOVATION (Feb. 2014), at 7–8.

This case is about the EPA's and NHTSA's authority to regulate the trailer portion of a tractor-trailer to improve fuel economy. *See* Greenhouse Gas Emissions and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles—Phase 2 ("Phase Two Rule"), 81 Fed. Reg. 73,478 (Oct. 25, 2016). Although the two agencies collaborated in establishing their respective standards, each issued its own regulations under independent and distinct grants of statutory authority.

The EPA acted under the Clean Air Act, which authorizes the agency to regulate emissions of air pollutants from "new motor vehicles[.]" 42 U.S.C. § 7521(a)(1). The Clean Air Act defines "motor vehicle" as "any self-propelled vehicle designed for transporting persons or property on a street or highway." *Id.* § 7550(2). The EPA viewed trailers as falling within that definition.

Because the trailers are tractor-propelled rather than self-propelled, I agree with the majority opinion's judgment that the Clean Air Act's text precludes the particular EPA regulations at issue here. I further agree with the majority opinion that, in seeking to reduce emissions, the EPA could instead regulate the tractors, including the types of trailers they are allowed to pull. Majority Op. 19 ("To be sure, NHTSA can regulate *tractors* based on the *trailers* they pull, as can the EPA."); *see also* Oral Arg. Tr. 10:16–11:1 (Association counsel answering "probably, yes" when asked if the EPA could "pass a regulation that says tractors are banned * * * from traveling on roads and highways if they're pulling loads that cause the tractor's emissions to increase by XX amount"). And nothing in today's decision forecloses the EPA from regulating the assembler of the tractor-trailer to ensure that the assembled tractor-trailers meet specified emission standards. *See* Oral Arg. Tr. 9:16–17 (Association counsel explaining that the EPA "definitely can regulate an assembler" that connects a tractor and a trailer).

But when it comes to the question of NHTSA's authority to issue its separate fuel economy regulations, I part ways with the majority opinion. NHTSA acted under a provision of the Energy Independence and Security Act of 2007 ("Energy Independence Act") that directed NHTSA to establish fuel efficiency standards for commercial medium- and heavy-duty "on-highway vehicles[.]" 49 U.S.C. § 32902(k)(2). Unlike the Clean Air Act, the Energy Independence Act contains no definition of the term "vehicle" other than regulating it in its on-highway operation and status. Given that focal point, NHTSA quite reasonably applied a long-established definition of vehicles that includes commercial trailers. The majority opinion's view that NHTSA's interpretation somehow runs afoul of "plain" non-existent text does not stand up.

3

**I**

**A**

Congress first established national fuel economy standards in 1975. *See* Energy Policy and Conservation Act, Pub. L. No. 94-163, § 301, 89 Stat. 871, 901 (1975). These initial standards, enacted to lessen dependence on foreign oil following the 1973–1974 oil embargo, applied only to passenger automobiles and light trucks. RICHARD K. LATTANZIO ET AL., CONG. RESEARCH SERV., IF10871, VEHICLE FUEL ECONOMY AND GREENHOUSE GAS STANDARDS 1 (2021); *see also* BRENT D. YACOBUCCI & ROBERT BAMBERGER, CONG. RESEARCH SERV., RL33413, AUTOMOBILE AND LIGHT TRUCK FUEL ECONOMY: THE CAFE STANDARDS 3 (2007).

Three decades later, as part of the Energy Independence Act, Congress extended fuel economy standards to include "work trucks and commercial medium-duty or heavy-duty on-highway vehicles[.]" Pub. L. No. 110-140, § 102(a)(2), 121 Stat. 1492, 1499 (2007) (codified at 49 U.S.C. § 32902(b)(1)(C)). Those fuel economy standards were just one piece of a comprehensive fuel efficiency program for work trucks and medium- and heavy-duty vehicles. *See* 49 U.S.C. § 32902(k)(1). Congress charged the Secretary of Transportation with implementing the program through rulemaking. *Id.* § 32902(k)(2).

Before the regulatory process could start, though, the Energy Independence Act required that the National Academy of Sciences first complete a study that assessed the fuel efficiency of medium- and heavy-duty on-highway vehicles. *See* 49 U.S.C. § 32902(k)(1); Energy Independence Act, §§ 107–108, 121 Stat. at 1505. Within a year of receiving the study, the Secretary of Transportation had to consult with the Secretary of Energy and the EPA Administrator both to

determine how to test and measure fuel efficiency in those vehicles and to identify what factors would affect and improve their fuel efficiency. 49 U.S.C. § 32902(k)(1)(A)–(D). The Secretary of Transportation delegated authority over the fuel efficiency program and the fuel economy standards to NHTSA. 49 C.F.R. §§ 1.94(c), 1.95(j)(3).

The Energy Independence Act directed NHTSA, again in consultation with the Secretary of Energy and the EPA Administrator, to implement the fuel efficiency program through rulemaking no more than two years after the study's completion. 49 U.S.C. § 32092(k)(2). The fuel efficiency program was to include "appropriate test methods, measurement metrics, fuel economy standards, and compliance and enforcement protocols that are appropriate, cost-effective, and technologically feasible[.]" *Id.*

In 2014, the National Academy of Sciences released the statutorily required fuel economy study that directly preceded the regulations at issue in this case. *See* NATIONAL RESEARCH COUNCIL OF THE NATIONAL ACADEMIES, REDUCING THE FUEL CONSUMPTION AND GREENHOUSE GAS EMISSIONS OF MEDIUM- AND HEAVY-DUTY VEHICLES, PHASE TWO: FIRST REPORT (2014). That study specifically addressed at length the effect that tractor-trailers (combined tractors and heavy-duty trailers) have on fuel consumption and efficiency. *Id*. at 67–87. The study determined that the largest tractor-trailers account for 60% of the fuel consumption of all heavy-duty on-highway vehicles, and that regulating the trailer's design and equipment "could substantially increase overall fuel savings" for the tractor-trailer on the highway. J.A. 309–310; *see also* J.A. 292 (2010 National Academy of Sciences study) ("Trailers, which present an important opportunity for fuel consumption reduction, can benefit from improvements in aerodynamics and tires.").

**B**

As required by the Energy Independence Act, NHTSA then proposed and, after a full notice-and-comment process, adopted final regulations aimed at improving the fuel efficiency and economy of on-highway medium- and heavy-duty vehicles, including tractor-trailers. *See* Greenhouse Gas Emissions and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles—Phase 2, 80 Fed. Reg. 40,138, 40,141, 40,161–40,162 (proposed July 13, 2015); Phase Two Rule, 81 Fed. Reg. 73,478, 73,504–73,505 (final rule).

The final rule explained the importance of regulating the fuel efficiency of the trailer portion of commercial on-highway tractor-trailers because large tractor-trailers account for 60% of the fuel consumption and carbon dioxide emissions from heavy-duty vehicles. Phase Two Rule, 81 Fed. Reg. at 73,485, 73,639. The EPA calculated that as much as one-third of the potential reduction in tractor-trailer fuel consumption and emissions could be achieved through regulation of the trailer's equipment and design alone. *Id.* at 73,516 n.89.[1]

---

[1] Because there are "no available technologies [that] reduce tailpipe greenhouse gas emissions per gallon of fuel combusted," a "rule that limits tailpipe greenhouse gas emissions is effectively identical to a rule that limits fuel consumption." *Delta Constr. Co. v. EPA*, 783 F.3d 1291, 1294 (D.C. Cir. 2015) (per curiam) (brackets omitted) (quoting Greenhouse Gas Emissions Standards and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles, 76 Fed. Reg. 57,106, 57,124–57,125 (Sept. 15, 2011)); *cf. Reduce Climate Change*, U.S. DEP'T OF ENERGY, https://www.fueleconomy.gov/feg/climate.shtml ("Pollution control devices cannot reduce your car's $CO_2$ emissions.") (last accessed

The regulations apply to two types of trailers:  box vans and non-box trailers.  *See* Phase Two Rule, 81 Fed. Reg. at 73,645–73,646.  Box vans are the most common kind of trailer.  *Id.* at 73,640.  They have a large, enclosed cargo space that is permanently attached to the trailer's frame, as well as fixed sides and a roof, and are generally between 28 and 53 feet in length.  *Id.* at 73,640, 73,645.  Anyone who has driven on a highway has seen countless box vans—the trailer portion of eighteen-wheeler semitrucks—passing by.

Non-box trailers, on the other hand, generally carry freight that will not easily fit in a box van.  *See* Phase Two Rule, 81 Fed. Reg. at 73,640.  Only three types of non-box trailers are subject to the regulations:  flatbed trailers, tank trailers, and container chassis.  *Id*. at 73,646–73,647.  Think of trailers that haul construction vehicles, containers of liquids, or enormous pipes.  *Id.*; *see also* 40 C.F.R. § 1037.5(g).

Trailer manufacturers can use a combination of technologies to improve fuel efficiency and reduce greenhouse gas emissions.  For most box vans, the regulations require the use of some combination of (i) aerodynamic devices such as side skirts and gap-closing devices, (ii) weight-reduction strategies, (iii) low-rolling resistance tires, and (iv) tire pressure systems.  *See* Phase Two Rule, 81 Fed. Reg. at 73,505, table I–7; *id.* at 73,643, 73,647–73,648, 73,665–73,667; *see also* 40 C.F.R. §§ 1037.107(a)(2), (3), 1037.515; 49 C.F.R. §§ 535.5(e)(1), 535.6(e)(3), (4).

---

Nov. 4, 2021); Revised 2023 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions Standards, 86 Fed. Reg. 43,726, 43,788 (proposed Aug. 10, 2021) ("Reducing fuel consumption is a significant means of reducing [greenhouse gas] emissions from the transportation fleet.").

For non-box trailers, the regulations require only the use of certain low-rolling resistance tires and tire pressure systems. *See* Phase Two Rule, 81 Fed. Reg. at 73,648, 73,667; *see also* 40 C.F.R. § 1037.107(a)(4); 49 C.F.R. § 535.5(e)(2).

The fuel efficiency measures chosen by the final rule draw on those already adopted by a number of trailer manufacturers as part of the voluntary SmartWay Transport Partnership program established by the EPA in 2004. That program encourages transportation companies, including trailer manufacturers, to take steps to improve fuel efficiency and to reduce greenhouse gas emissions. Between 2004 and 2016 more than 3,000 firms, most of them trucking fleets, participated in the program. *See* Greenhouse Gas Emissions Standards and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles ("Phase One Proposed Rule"), 75 Fed. Reg. 74,152, 74,159 (proposed Nov. 30, 2010); Phase Two Rule, 81 Fed. Reg. at 73,640–73,641; NATIONAL RESEARCH COUNCIL, REDUCING THE FUEL CONSUMPTION AND GREENHOUSE GAS EMISSIONS OF MEDIUM- AND HEAVY-DUTY VEHICLES, at 72.

## II

NHTSA acted well within its delegated regulatory authority in establishing fuel efficiency requirements for the trailer portion of tractor-trailers that regularly travel the Nation's highways.

## A

To begin with, because the Energy Independence Act does not define the term "vehicle" other than requiring that (as relevant here) it be a medium- or heavy-duty on-highway commercial vehicle, the familiar *Chevron* framework applies. *See Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2142

(2016); *Cigar Ass'n of America v. FDA*, 5 F.4th 68, 77 (D.C. Cir. 2021). That is because Congress expressly "delegated authority to the agency generally to make rules carrying the force of law," *United States v. Mead Corp.*, 533 U.S. 218, 226–227 (2001), and, in fact, the statute *requires* NHTSA to implement the fuel economy standards "by regulation," 49 U.S.C. § 32902(k)(2). That "express congressional authorization[] to engage in the process of rulemaking" is a "very good indicator" that Congress intended the resulting regulations to carry the force of law and to be reviewed under *Chevron*'s deferential standard. *Mead Corp.*, 533 U.S. at 229; *accord Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016).

In addition, NHTSA's regulation was promulgated as a legislative rule through full notice-and-comment rulemaking for the specific purpose of fulfilling that statutory obligation. *See Mead Corp.*, 533 U.S. at 226–227 ("[A]dministrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law" and "the agency interpretation claiming deference was promulgated in the exercise of that authority"). NHTSA expressly invoked its statutorily delegated authority in outlining the "mandatory standards" its regulations established. *See Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 172 (2007); *Anna Jacques Hosp. v. Burwell*, 797 F.3d 1155, 1166 (D.C. Cir. 2015).

Tellingly, neither the Association nor the majority opinion dispute that the regulations established for trailers' on-highway operation are the type of legislative rule that qualifies for *Chevron* deference if there is ambiguity in the term "vehicle."

The Chevron framework has two steps. First, we determine "whether Congress has directly spoken to the precise question at issue" because, "[i]f the intent of Congress is clear, that is the end of the matter." *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–843 (1984). But if the statute is "silent or ambiguous," then we will uphold an agency's interpretation as long as it is reasonable. *See City of Arlington v. FCC*, 569 U.S. 290, 296 (2013); *Chevron*, 467 U.S. at 843; *see also HollyFrontier Cheyenne Refin., LLC v. Renewable Fuels Ass'n*, 141 S. Ct. 2172, 2184 n.1 (2021) (Barrett, J., dissenting).

Because the Energy Independence Act does not define "vehicle" and because NHTSA's definition is reasonable and consistent with statutory text and structure, as well as common usage, NHTSA was well within its lane in regulating how commercial trailers are designed for use on highways.

**B**

**1**

The Energy Independence Act contains no definition of the term "vehicle" beyond requiring (as relevant here) that the vehicles, when operating "on [the] highway," qualify as "commercial medium- [or] heavy-duty vehicles[.]" 49 U.S.C. § 32902(b)(1)(C). The Act then defines the term "commercial medium- and heavy-duty on-highway vehicle" to mean "an on-highway vehicle with a gross vehicle weight rating of 10,000 pounds or more." *Id.* § 32901(7). There is no dispute that, whether alone or combined with a tractor, the trailers regulated by NHTSA are "commercial" and satisfy that gross weight criterion. *See, e.g.*, EPA & NHTSA, GREENHOUSE GAS EMISSIONS AND FUEL EFFICIENCY STANDARDS FOR MEDIUM- AND HEAVY-DUTY ENGINES AND VEHICLES - PHASE 2: REGULATORY IMPACT ANALYSIS (2016), at 3-72–3-73 (finding

that a typical large box trailer "has an empty weight ranging between 13,500 and 14,000 pounds[,]" flatbed and tanker trailers weigh approximately 10,000 pounds empty, and medium- and heavy-duty semi-trailers have average payloads ranging between 26,343 pounds and 37,190 pounds).

By defining the regulated vehicle in terms of its "on-highway" status, the statute focuses on vehicles in their highway-using and highway-operating form. So their character when rolling off the assembly line or otherwise prior to that highway function does not textually cabin what qualifies as a vehicle for purposes of Section 32902(b)(1)(C). That stands in sharp contrast to the Clean Air Act definition on which the EPA attempted to rely in regulating trailers, which defines "motor vehicle" as "any *self-propelled* vehicle *designed for transporting* persons or property on a street or highway." 42 U.S.C. § 7550(2) (emphasis added); *compare* 49 U.S.C. § 32901(a)(3) (defining "automobile" as, *inter alia,* "a 4-wheeled vehicle that is propelled by fuel, or by alternative fuel, *manufactured primarily for* use on public streets, roads, and highways") (emphasis added).

Notably, at the time the Energy Independence Act was adopted—and long before—Congress had statutorily defined "vehicle" in other portions of Title 49 administered by NHTSA to include the trailer portion of tractor-trailers. The Motor Vehicle Information and Cost Savings Act defines "motor vehicle" to include "vehicle[s]" that are "driven or *drawn by* mechanical power" on public streets, roads, or highways. Pub. L. No. 92-513, § 2(15), 86 Stat. 947, 948 (1972) (emphasis added). In fact, Congress first defined a regulated vehicle in language that includes trailers as far back as 1966 in NHTSA's organic statute, the National Traffic and Motor Vehicle Safety Act of 1966. That definition provided: "'Motor vehicle' means any vehicle driven or drawn by mechanical power[.]"

Pub. L. No. 89-563, § 102(3), 80 Stat. 718, 718.[2]  Soon thereafter, NHTSA promulgated a regulation that specifically placed trailers within that definition of motor vehicle.  *See* 49 C.F.R. § 571.3 ("*Trailer* means a motor vehicle with or without motive power, designed for carrying persons or property and for being drawn by another motor vehicle.") (emphasis in original).

Other provisions in Title 49 have, since the 1980s, explicitly included trailers and semitrailers within their "motor vehicle" definitions.  *See* National Driver Register Act of 1982, Pub. L. No. 97-364, § 202(5), 96 Stat. 1740, 1741 (codified as amended at 49 U.S.C. § 30301(4)) ("[A] vehicle, machine, tractor, trailer, or semitrailer propelled or drawn by mechanical power and used on a highway * * * [.]"); Commercial Motor Vehicle Safety Act of 1986, Pub. L. No. 99-570, § 12019(5), 100 Stat. 3207-170, 3207-188 (codified as amended at 49 U.S.C. § 31301(12)) ("[A] vehicle, machine, tractor, trailer, or semitrailer propelled or drawn by mechanical power * * * [.]").

"Vehicle" had a similarly capacious meaning in common usage in 2007, when Congress passed the Energy Independence Act.  Black's Law Dictionary, for example, defined "vehicle" as encompassing "[a]ny conveyance used in transporting passengers or things by land, water, or air." BLACK'S LAW DICTIONARY 1589 (8th ed. 2004).  For non-lawyers, Webster's defined "vehicle" to include "a means of carrying or transporting something:  Conveyance[,]" "a carrier of goods or passengers[,]" "a container in which something is

---

[2] The Motor Vehicle Safety Act of 1966 created the National Traffic Safety Agency, *see* Pub. L. No. 89-563, § 115, 80 Stat. 718, 727, which became part of NHTSA after NHTSA was established in the Highway Safety Act of 1970, *see* Pub. L. No. 91-605, § 202(a), 84 Stat. 1713, 1739–1740.

conveyed[,]" and "a piece of mechanized equipment[.]" WEBSTER'S NEW INT'L DICTIONARY 2538 (def. 5) (3d ed. 2002); *see also* 19 OXFORD ENGLISH DICTIONARY 480 (defs. 6, 7a) (2d ed. 1989) (defining "vehicle" as "[a] means of conveyance provided with wheels or runners and used for the carriage of persons or goods; a carriage, cart, wagon, sledge, or similar contrivance" and "[a]ny means of carriage, conveyance, or transport; a receptacle in which anything is placed in order to be moved"); WEBSTER'S NEW INT'L DICTIONARY 2824 (def. 1) (2d ed. 1941) ("That in or on which a person or thing is or may be carried from one place to another, esp. along the ground, also through the air; any moving support or container fitted or used for the conveyance of bulky objects; a means of conveyance.").

Also, as the majority opinion notes, in defining the meaning of statutory terms, context matters. *See, e.g.*, *Wisconsin Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2071–2072 (2018); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132–133 (2000); Majority Op. 13. The context in which the Energy Independence Act uses "vehicle" is not an abstract one; the statute refers to a "commercial" "on-highway vehicle[.]" 49 U.S.C. § 32902(b)(1)(C). So the types of trailers subject to regulation are only commercial trailers to be used on highways, which means a trailer combined with a tractor—that is, tractor-trailers. Trailers, after all, only go on highways joined with a tractor or truck.

And at the time of the Energy Independence Act's adoption, Congress would have understood that, when driving on the highways and roadways, a conjoined tractor-trailer had its own singular vehicular identity as a work vehicle: in common parlance, a semitruck or semitrailer. Webster's, for example, defined "semi-trailer" as a "trucking rig made up of a tractor and a semitrailer—called also *semi*[.]" WEBSTER'S

NEW INT'L DICTIONARY 2065 (def. 2) (3d. ed. 2002). This meaning traces back to well before Congress founded NHTSA. In 1941, Webster's defined a semitrailer as "[a] *highway vehicle* which when running is supported at its forward end by a fifth wheel mounted on a motor truck or tractor[.]" WEBSTER'S NEW INT'L DICTIONARY 2276 (def. 1) (2d ed. 1941) (emphasis added).

Indeed, since the invention of the semitrailer by a Detroit blacksmith in 1914, tractors and trailers have functioned together as work vehicles to drive trillions of miles—and consume hundreds of billions of gallons of fuel—across the United States.[3] In fact, it is largely in semitruck form that tractor-trailers fulfill their commercial *raison d'être*—their vital transportation function of moving supplies and goods across the Nation. *See* FREIGHT FACTS AND FIGURES 2017, at 3-23 (truck-trailer combinations "accounted for approximately 60.8 percent of commercial truck travel" in the United States in 2015).

---

[3] *See Fruehauf Trailer Corporation*, in Britannica Academic, Encyclopedia Britannica, (May 17, 2016), academic.eb.com/levels/collegiate/article/Fruehauf-Trailer-Corporation/35519 (last accessed Nov. 4, 2021); *U.S. Vehicle-Miles*, BUREAU TRANSP. STAT., https://www.bts.gov/content/us-vehicle-miles (last accessed Nov. 4, 2021); BUREAU TRANSP. STAT., FREIGHT FACTS AND FIGURES 2017, at 6–7 (June 2018) (truck-trailer combinations consumed more than 86 billion gallons of fuel between 2013 and 2015 alone); BUREAU TRANSP. STAT., APPENDIX B – GLOSSARY, at 4, https://www.bts.gov/sites/bts.dot.gov/files/docs/browse-statistical-products-and-data/national-transportation-statistics/217556/appendix-b-glossary.pdf (last accessed Nov. 4, 2021) (defining "combination truck").

In short, the Energy Independence Act does not textually constrain the meaning of vehicle in a way that excludes commercial trailers operated on a highway as tractor-trailers. Quite the opposite: Ample preexisting and contemporary statutory provisions, regulations, dictionaries, and common understanding firmly embrace trailers in their on-highway role within the meaning of "vehicle." So NHTSA's regulatory choice was not statutorily foreclosed under *Chevron's* first step.

**2**

The majority opinion openly recognizes the ambiguity in the term "vehicle." After all, the "No Vehicles in the Park" example that the opinion invokes would not have become "the most famous hypothetical in the common law world[,]" or have puzzled first-year law students for six decades if the meaning of vehicle were not ambiguous. *See* Majority Op. 13 (quoting H.L.A. Hart, *Positivism and Separation of Law and Morals*, 71 HARV. L. REV. 593, 607 (1958), and Frederick Schauer, *A Critical Guide to Vehicles in the Park*, 83 N.Y.U. L. REV. 1109, 1109 (2008)). In defining what *Chevron* leaves to agency discretion, it would be hard to improve on what Hart believed his thought experiment illustrated: The existence of a "penumbra of debatable cases in which words are neither obviously applicable nor obviously ruled out." Hart, *Positivism*, *supra*, at 607; *see also* Schauer, *A Critical Guide*, *supra*, at 1109 ("Hart used the example to maintain that rules have a core of clear applications surrounded by a penumbra of uncertainty[.]"). Such debatable cases "will be resolved," under *Chevron*, "within the bounds of reasonable interpretation, not by the courts but by the administering agency." *City of Arlington*, 569 U.S. at 296.

Nevertheless, despite the term's famous ambiguity, and the absence of any definition of "vehicle" in the Energy Independence Act at all, let alone one that forecloses the long-established inclusion of semitrailers, the majority opinion offers a laundry list of reasons that it believes "rule[] out trailers." Majority Op. 15. But all of those reasons wash out.

First, the majority opinion reasons that the statute is about "fuel economy," and trailers do not "*use* fuel[,]" Majority Op. 15 (emphasis in original).

That argument blinks away the statutory focus on the fuel economy of "on-highway" vehicles. On the highway, trailers unite with tractors into a single vehicle—a tractor-trailer or, colloquially, a semitruck. And it is an undisputed fact on the record before us that the trailer part of the semitruck barreling down a highway "contribute[s] substantially" to the fuel consumption and sharply diminished fuel economy of the tractor-trailer. Phase Two Rule, 81 Fed. Reg. at 73,639. As the National Academy of Sciences found in its statutorily-directed study, when it comes to fuel economy "[t]he tractor and trailer are fundamentally inseparable in addressing aerodynamic drag[.]" NATIONAL RESEARCH COUNCIL, REDUCING THE FUEL CONSUMPTION AND GREENHOUSE GAS EMISSIONS OF MEDIUM- AND HEAVY-DUTY VEHICLES, at 38; *cf.* NATIONAL ACADEMIES OF SCIENCES, ENGINEERING, AND MEDICINE, REDUCING FUEL CONSUMPTION AND GREENHOUSE GAS EMISSIONS OF MEDIUM- AND HEAVY-DUTY VEHICLES, PHASE TWO: FINAL REPORT 166–167 (2020) (relating that, in a Daimler project, "trailer improvements delivered 72 percent of the total vehicle aerodynamic improvement, but requir[ed] only one-third of the aerodynamic engineering effort").

In other words, tractor-trailers consume substantially more fuel than the tractor alone. Phase Two Rule, 81 Fed. Reg.

at 73,516. So the "average number of miles traveled by" a tractor-trailer "for each gallon of gasoline[,]" as well as the additional amount of fuel per mile caused by the trailer portion itself, present distinct fuel-economy questions that are readily measurable and just as readily regulable under the statutory definition of "fuel economy[.]" 49 U.S.C. § 32901(11); *see also, e.g.*, NATIONAL RESEARCH COUNCIL, REDUCING THE FUEL CONSUMPTION AND GREENHOUSE GAS EMISSIONS OF MEDIUM- AND HEAVY-DUTY VEHICLES, at 83 (finding that regulating non-box trailers "could substantially increase overall fuel savings"). Nothing in the statutory text or references suggests that Congress wanted to avert its eyes to this most commonplace presence on the highways.

Second, the majority opinion seizes on Congress's reference to a "heavy-duty truck" rather than a "heavy-duty vehicle" in different provisions—Sections 107 and 108 of the Act. *See* Majority Op. 16–17; *see also* Association Br. 43–45. Those Sections call on the National Academy of Sciences to, *inter alia*, study "medium-duty and heavy-duty truck fuel economy standards" Pub. L. No. 110-140, § 108(a), 121 Stat. at 1505, and to update its report at five-year intervals until 2025. *Id.* at § 107(c), 121 Stat. at 1504. In the majority opinion's view, the Act's two references to "medium-duty and heavy-duty truck[s]" rather than "vehicles" unambiguously shows that Congress treats trucks and vehicles synonymously. And because the majority opinion believes all trucks consume fuel, it thinks all vehicles must consume fuel as well.

The problem is that the term "truck" does not exclude trailers, especially in their on-highway form as tractor-trailers—a.k.a. semitrucks. In fact, the National Academy of Sciences itself, in the very study that Section 108 ordered, read the term "truck" to encompass tractor-trailers as a distinct vehicular entity. *See* NATIONAL RESEARCH COUNCIL OF THE

NATIONAL ACADEMIES, TECHNOLOGIES AND APPROACHES TO REDUCING THE FUEL CONSUMPTION OF MEDIUM- AND HEAVY-DUTY VEHICLES 2 (2010) ("There are literally thousands of different configurations for vehicles, including bucket trucks, pickup trucks, garbage trucks, delivery vehicles, and *long-haul tractor trailers*.") (emphasis added).

So much for a clear statutory preclusion of on-highway trailers.

Third, the majority opinion tries the *noscitur a sociis* canon. *See* Majority Op. 15–17; *see also* Association Br. 42–43. In English, that canon says that words are known by the company they keep. *Yates v. United States*, 574 U.S. 528, 543 (2015) (plurality opinion). The majority opinion points to Section 32902(b)'s command that the Secretary of Transportation issue fuel economy standards for (i) "passenger automobiles[,]" (ii) "non-passenger automobiles[,]" and (iii) "work trucks and commercial medium-duty or heavy-duty on-highway vehicles[,]" 49 U.S.C. § 32902(b)(1), and reasons that because passenger automobiles, non-passenger automobiles, and work trucks "use fuel," the same must be true of "vehicles." Majority Op. 15–17.

No dice. For starters, since Congress's concern was fuel efficiency and fuel economy, the common denominator is just as reasonably that each category *uses up* fuel when on the road. Trailers certainly do that in their on-highway status: Tractor-trailers "*use* fuel" (Majority Op. 15) (emphasis in original) and, because of the trailer portion, they use up fuel at a markedly higher rate, with less fuel efficiency and less fuel economy than the tractor portion alone. That measurable difference can be remediated through the types of fuel efficiency and fuel economy measures for which the Energy Independence Act calls.

In addition, the *noscitur* canon is generally applied when the statutory context indicates that Congress intended for different words to share similar meanings—as indicated, for example, by the statute applying a single rule to a string of related terms. *See, e.g.*, *McDonnell v. United States*, 136 S. Ct. 2355, 2365, 2368–2369 (2016) (interpreting "question" and "matter" in statute barring officials from soliciting or accepting bribes in return for "any decision or action on any question, matter, cause, suit, proceeding or controversy * * * .") (quoting 18 U.S.C. § 201(a)(3)); *United States v. Bronstein*, 849 F.3d 1101, 1104, 1108–1109 (D.C. Cir. 2017) (interpreting "harangue" and "oration" in a provision making it unlawful to "make a harangue or oration, or utter loud, threatening, or abusive language in the Supreme Court Building or grounds") (quoting 40 U.S.C. § 6134).

Here, by contrast, the statutory definitions show that, other than the ability to improve fuel economy, Congress thought of passenger vehicles, non-passenger vehicles, work trucks, and medium-or heavy-duty commercial vehicles as each capturing different types of vehicles. For example, the definitions of "automobile" and "non-passenger automobile" both exclude "work truck[s]." 49 U.S.C. § 32901(a)(3), (a)(3)(C), (a)(17). The statutory definition of automobile expressly requires that it be "propelled by fuel," while the definitions of "work truck" and of "commercial medium- and heavy-duty on-highway vehicle" do not. 49 U.S.C. § 32901(a)(3), (a)(7), (a)(19); *cf. Salinas v. United States R.R. Retirement Board*, 141 S. Ct. 691, 698 (2021) (Absence of limiting language is telling because "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion") (internal quotation marks and citation omitted).

19

Even more to the point, unlike in the *noscitur* cases cited above, the Energy Independence Act applies a different fuel-economy rule to work trucks and medium- and heavy-duty vehicles than it does to automobiles. For work trucks and medium- and heavy-duty vehicles—but not for automobiles—Congress tasked the Secretary of Transportation (NHTSA) with creating a comprehensive fuel efficiency program, of which fuel economy standards are just a part. *See* 49 U.S.C. § 32902(b)(1)(C), (k). So for work trucks and medium- and heavy-duty vehicles, Congress expressly undertook a broader regulatory approach that considered more than just the consumption of fuel per mile.

More specifically, Congress instructed the Secretary of Transportation, in consultation with the Department of Energy and the EPA, to determine "the appropriate metric for measuring and expressing commercial medium- and heavy-duty on-highway vehicle and work truck fuel efficiency performance[.]" 49 U.S.C. § 32902(k)(1)(B). Congress relied on the standard "fuel economy" metric of miles-per-gallon for automobiles, *see id*. § 32902(b)(2), but instructed the agencies to think differently about work trucks and medium- or heavy-duty on-highway vehicles. And NHTSA did. In the final rule, NHTSA chose a standard for box trailers not in miles-per-gallon but in gallons-per-1,000-ton-mile. *See* Phase Two Rule, 81 Fed. Reg. at 73,647–73,648; *cf. Gasoline Vehicles: Learn More About the Label*, U.S. DEP'T OF ENERGY, https://www.fueleconomy.gov/feg/label/learn-more-gasoline-label.shtml (last accessed Nov. 4, 2021) ("[I]t may be more meaningful to express fuel efficiency in terms of consumption (e.g., gallons per mile * * *) rather than in terms of economy (miles per gallon).").

By applying this broader approach and different fuel-economy metric specifically to work trucks and highway

vehicles, the statute categorized them as horses of a different color from "passenger automobiles" and "non-passenger automobiles." So the *noscitur a sociis* tool does not fit here.

Fourth, the majority opinion declares it a "nail in [NHTSA's] coffin" that the definition of "motor vehicle" as "a vehicle driven or drawn by mechanical power," *see* 49 U.S.C. § 32101(7), does not apply to Section 32902 of the Energy Independence Act. Majority Op. 17–18.

Of course that definition is not statutorily made applicable to Section 32902. The whole reason we are here is because there is no governing definition of "vehicle" in Section 32902.

More to the point, the relevant phrase in Section 32902 is not "motor vehicle," but "medium-duty or heavy-duty on-highway vehicles," 49 U.S.C. § 32902(b)(1)(C). So the only question before this court is whether anything in the text of Sections 32902 or 32901, or even in Section 32101, precludes NHTSA from reading the undefined term "vehicle" in the phrase "medium-duty or heavy-duty on-highway vehicles" in the same way that other parts of Title 49 expressly read "vehicle"—as including trailers.

There is not. Section 32101's introductory clause limiting the required application of its "motor vehicle" definition simply means that definitional symmetry was not mandated; it does not mean that adopting a similar meaning of "vehicle" was prohibited. *See Fisher v. Pension Benefit Guar. Corp.*, 994 F.3d 664, 671 (D.C. Cir. 2021) (When considering statutes administered by agencies, silence "may signal permission rather than proscription") (internal quotation marks omitted) (quoting *Catawba County v. EPA*, 571 F.3d 20, 36 (D.C. Cir. 2009) (per curiam)); *Van Hollen, Jr. v. Federal Election Comm'n*, 811 F.3d 486, 493–494 (D.C. Cir. 2016) ("[A] congressional mandate in one section and silence in another

often suggests not a prohibition but simply a decision not to mandate any solution in the second context, i.e., to leave the question to agency discretion.") (internal quotation marks omitted) (quoting *Catawba County*, 571 F.3d at 36).[4]

Also, Section 32101 is not the only place that the trailer-including definition of "motor vehicle" appears.  It also appears in Section 30102 of Title 49, which governs Chapter 301 on Motor Vehicle Safety.  Congress's pattern of usage, then, textually supports NHTSA's judgment in this case; it certainly does not textually foreclose it.  "[T]hat Congress spoke in one place but remained silent in another, as it did here, 'rarely if ever' suffices for the 'direct answer' that *Chevron* step one requires."  *Catawba County*, 571 F.3d at 36 (quoting *Cheney R.R. Co. v. ICC*, 902 F.2d 66, 69 (D.C. Cir. 1990)).

The majority opinion responds that it makes sense to define motor vehicle as encompassing trailers in Chapter 301, which addresses Motor Vehicle Safety, because trailers have safety features such as lights, turn signals, and reflectors.  Majority Op. 18 n.14.  But as the regulations before us show, trailers also have features that significantly affect fuel economy and efficiency—the concerns of Chapter 329.[5]

---

[4] Chapter 329 does separately use the phrase "motor vehicle," *see* 49 U.S.C. § 32902(d)(3), (f); *see also id.* § 32913 (mentioning "the motor vehicle industry"), so those are the provisions for which the exclusionary phrase that the majority opinion seizes upon would seem to have actual relevance.

[5] The majority opinion's premise is that Congress used the "motor vehicle" definition only in chapters that were relevant to trailers.  Not so.  The same definition also applies, for example, to Chapter 327, which prohibits tampering with odometers—a feature

22

Fifth, the majority opinion argues that by defining "commercial medium- and heavy-duty on-highway vehicle" in terms of the vehicle's "gross vehicle weight rating[,]" the statute excludes trailers. Majority Op. 18 n.15 (quoting 49 U.S.C. § 32901(a)(7)). That is so, according to the majority opinion, because while NHTSA regulations define gross vehicle weight rating to mean "the maximum load that can be carried by a vehicle, including the weight of the vehicle itself[,]" the regulations also define a similar metric for tractor-trailers: gross combined weight rating. Phase Two Rule, 81 Fed. Reg. at 73,845 n.26 (explaining that gross combined weight rating "describes the maximum load that the vehicle can haul, including the weight of a loaded trailer and the vehicle itself"). The majority sees Congress's choice to define the vehicles at issue here in terms of the more general weight rating category as excluding trailers.

That is a non sequitur. For one thing, by using the more general weight category, Congress swept in more vehicles, not fewer. If Congress had defined "commercial medium- and heavy-duty on-highway vehicle[s]" in reference to gross combined weight rating, it would have limited that term just to semitrailers. Congress plainly covered more medium- and heavy-duty vehicles than semitrailers.

For another thing, as the regulatory definition of gross combination weight rating makes clear, trailers can also have gross vehicle weight ratings. *See* 49 C.F.R. § 383.5 (defining gross combination weight rating in terms of, *inter alia*, "[t]he sum of the gross vehicle weight ratings * * * or the gross vehicle weights * * * of the power unit *and* the towed unit(s)")

---

that the majority opinion does not claim trailers themselves have. *See* 49 U.S.C. § 32701.

(emphasis added).[6] It is no surprise, then, that other regulations apply to certain trailers based on their gross vehicle weight rating. *See, e.g.*, 49 C.F.R. § 571.224 (establishing certain requirements for "trailers and semitrailers with a gross vehicle weight rating * * * of 4,536 kg or more"); *see also* NHTSA, THE EFFECTIVENESS OF UNDERRIDE GUARDS FOR HEAVY TRAILERS (2010), at ii (explaining related NHTSA mandates for "all trailers with [gross vehicle weight ratings] of 10,000 pounds or greater"). So the majority opinion's focus on how vehicle weight is calculated at the very least underscores the statute's ambiguity, and does much to reinforce NHTSA's conclusion.

Lastly, the majority opinion resorts to the slippery slope. It says that trailers cannot be vehicles because tractors are already vehicles before the trailers are hooked on. Otherwise, the majority opinion worries, the combination of a truck and anything that affects its fuel economy, including heavy suitcases or bike racks, would qualify. Majority Op. 19, 19 n.16; *see also* Association Br. 39.

That tack might work if tractor-suitcases or tractor-bike racks (i) could even conceivably be thought of as identifiable "commercial medium- [or] heavy-duty on-highway" vehicles in a way distinct from the tractor itself, 49 U.S.C. § 32902(b)(1)(C); (ii) have long been statutorily defined as vehicles, including in the relevant agency's organic statute; and (iii) fit naturally within dictionary definitions and the common understanding of a distinct on-highway vehicle. It was textually permissible for the agency to determine that on-

---

[6] The regulations double down on trailers' status as vehicles by providing that the gross combination weight rating of a truck "will not be used to define a commercial motor vehicle when the [truck] is not towing *another vehicle*." 49 C.F.R. § 383.5 (emphasis added).

highway tractor-trailers are themselves vehicles. That does not make tractor-suitcases or tractor-bike racks distinct types of vehicles, and thereby give NHTSA the power to regulate suitcases or bike racks. There is neither slope nor slip.

In a similar vein the majority opinion argues that on-highway vehicles must be designed for use on a highway, because otherwise NHTSA could regulate vehicles "like bulldozers and excavators[.]" Majority Op. 15 n.11. But if Congress wanted to require that regulated "on-highway vehicle[s]" be designed for use on a highway, it could have said as much, just as it did elsewhere in the same subsection. *See* 49 U.S.C. § 32901(a)(3) ("automobile" means, *inter alia*, "a 4-wheeled vehicle that is propelled by fuel, or by alternative fuel, *manufactured primarily for* use on public streets, roads, and highways") (emphasis added); *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1323 (2020) (Courts "generally presume[] that when Congress includes particular language in one section of a statute but omits it in another, Congress intended a difference in meaning") (internal quotation marks and citations omitted).

Anyhow, commercial trailers are *designed specifically* for highway transportation use.[7] It is, after all, commercial trailers that transport bulldozers down highways to their off-highway sites.

---

[7] That does not mean NHTSA can prescribe fuel economy standards for just any vehicle that happens on rare occasion to wind up briefly on a highway. *See Wisconsin Dep't of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 231 (1992) ("[T]he venerable maxim *de minimis non curat lex* ('the law cares not for trifles') is part of the established background of legal principles against which all enactments are adopted * * * .").

\* \* \* \* \*

At the end of the day, the clear prohibition on trailers falling within NHTSA's regulatory authority that the majority opinion tries to wring out of statutory silence is illusory.

**III**

**A**

Because nothing in the statutory text or structure precludes NHTSA's interpretation of "vehicles" from including the trailer portion of tractor-trailers that routinely travel the highways, the last question under *Chevron* is whether NHTSA's reading is reasonable. *See* 467 U.S. at 843–844; *City of Arlington*, 569 U.S. at 296; *see also Dada v. Mukasey*, 554 U.S. 1, 29 n.1 (2008) (Scalia, J., dissenting). For many of the reasons already discussed regarding the statutory text, established definitions, the nature of on-highway trailers, and their considerable impact on the fuel economy and efficiency of tractor-trailers, NHTSA's interpretation passes muster.

To start, NHTSA's interpretation is consistent with the text of the Energy Independence Act. As noted before, including these on-highway trailers—which take the form of tractor-trailers (or, in common parlance, semitrucks)—in the definition of vehicle is consistent with statutory, dictionary, and common usage. *See* pages 9–25, *supra*.

NHTSA's interpretation also maps onto the statute's purpose. The central purpose of the Energy Independence Act in general, and Section 32902 in particular, is to increase the fuel efficiency of the vehicles and conveyances that travel the Nation's highways. *See* Pub. L. No. 110-140, § 102(a)(2), 121 Stat. at 1498; *id*. ("Title I—Energy Security Through Improved Vehicle Fuel Economy"). Section 32902(k) separately requires

the Secretary of Transportation to develop a fuel efficiency program for medium- and heavy-duty vehicles "designed to achieve the *maximum* feasible improvement" in fuel efficiency for those vehicles. 49 U.S.C. § 32902(k)(2) (emphasis added).

Including commercial on-highway trailers within the scope of medium- and heavy-duty vehicles contributes considerably to that goal, while omitting them would materially impede its achievement. Large tractor-trailers account for 60% of the fuel consumption of heavy-duty vehicles, and the trailer "contribute[s] substantially" to the fuel consumption of the tractor-trailer as a whole. Phase Two Rule, 81 Fed. Reg. at 73,639. The National Academy of Sciences estimated that "a given percentage reduction" in fuel consumption for tractor-trailers "will save more fuel than a matching percent improvement in any other vehicle category[,]" and that "about half of the total possible fuel savings" in all medium- and heavy-duty vehicles comes from tractor-trailers. J.A. 306. Notably, one-third of that potential savings comes from regulating the trailer's design and equipment. Phase Two Rule, 81 Fed. Reg. at 73,516 n.89. So regulating the trailer portion "present[s] an important opportunity" for fuel efficiency improvements. J.A. 292 (2010 National Academy of Sciences study).

For all of those reasons, this court should hold that NHTSA acted reasonably and within its statutory authority in regulating trailers.

**B**

The Association (but not the majority opinion) argues that deference to NHTSA is inapplicable because, in August 2017, NHTSA and the EPA wrote to the Association indicating their intent to reconsider the trailer provisions through new notice-

and-comment rulemaking. *See* Association Br. 48. The Association is incorrect.

First, nothing ever came of the agency's plans to revisit the topic, and, in December 2019, NHTSA did not object to this case going forward. Our duty is to decide the case before us, not some case that might have been. *Cf. Hüls America Inc. v. Browner*, 83 F.3d 445, 450 n.6 (D.C. Cir. 1996) (regulation "merit[ed] traditional *Chevron* deference" where the agency "ha[d] never adopted any different interpretation" of the statutory provision at issue, although the agency had "suggested it could reconsider" the regulation).

Second, NHTSA's regulations were adopted through notice-and-comment rulemaking and have the force of law. That status is not lost just because an agency writes in a letter about its intent to reconsider the regulation. Under the Administrative Procedure Act, an agency can only "amend or repeal" a regulation "us[ing] the same procedures * * * as [it] used to issue the rule in the first instance." *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 101 (2015).

The Association relies on *Global Tel\*Link v. FCC*, 866 F.3d 397 (D.C. Cir. 2017). That case has no application here. In that case, the Federal Communications Commission issued an order that used industry-wide averages to set caps on the interstate and intrastate rates and fees that payphone providers could charge for phone calls made by inmates in correctional facilities. *Id*. at 405. But after the Commission "experienced 'significant changes in [its] composition,'" it formally advised the court that it "was 'abandoning * * * the contention[s] * * * [both] that the Commission had authority to cap intrastate rates" and "'that the Commission [had] lawfully considered industry-wide averages in setting the rate caps.'" *Id.* at 406 (first alteration and omissions in original; citations omitted).

In deciding the case, this court emphasized the "oddity" of determining whether the parts of the order addressing intrastate rates and industry-wide costs warranted *Chevron* deference "when the agency ha[d] abandoned those positions." *Global Tel\*Link*, 866 F.3d at 407–408. As a result, the court assessed the "best reading" of the statute at issue, *id.* at 408 (quoting *Miller v. Clinton*, 687 F.3d 1332, 1342 (D.C. Cir. 2012)), and vacated the order's provisions related to caps on intrastate rates and the use of industry-averaged cost data, *id.* at 416.

This case is quite different. NHTSA has not "abandoned" its trailer regulations. It has continued to defend them actively in this court and to claim *Chevron* deference. *See* Agencies Br. 14, 25–27.

## C

Lastly, the Association argues that, if the EPA's regulations are vacated—as the court today orders—then NHTSA's fuel efficiency regulations must also be vacated. *See* Association Br. 27. But the agencies intended the two sets of regulations to stand on their own, and any overlap in the compliance process could be resolved on remand.

The Association views the question as one of severability. *See* Association Br. 27–36. That seems an ill fit. While severability principles apply within a single statute, *see, e.g.*, *Free Enterprise Fund v. Public Co. Acct. Oversight Board*, 561 U.S. 477, 508 (2010), or regulation, *see, e.g.*, *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988), that is not the practice for separate agency regulations issued by distinct agencies under different statutory schemes. Nevertheless, because both parties encouraged the court to look at the issue through the lens of severability, *see* Association Br. 27–36; Agencies Br. 40–52; Oral Arg. Tr. 36:23–25, I will do so for argument's sake.

Under a severability analysis, this court asks (i) whether the agencies intended the regulations to be severable, and (ii) whether the remaining regulations could function without the stricken portion. *See Verizon v. FCC*, 740 F.3d 623, 659 (D.C. Cir. 2014) (citing *MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001)). Courts presume that regulations are severable, *see Community for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1394 (D.C. Cir. 1990), and that presumption holds here.

The driving factor in severability analysis is agency intent. *See Sierra Club v. FERC*, 867 F.3d 1357, 1366 (D.C. Cir. 2017) ("The question whether an agency order is severable turns on agency intent."). Courts should only decline to sever regulations if "there is substantial doubt that the agency would have adopted the same disposition regarding the unchallenged portion if the challenged portion were subtracted[.]" *Sierra Club*, 867 F.3d at 1366 (quoting *Epsilon Elecs., Inc. v. United States Dep't of Treasury*, 857 F.3d 913, 929 (D.C. Cir. 2017)).

I need look no further than the agencies' own words to dispel any doubt. In response to comments, the agencies said explicitly that "the NHTSA fuel consumption standards are independent of the EPA greenhouse gas standards and vice versa," and that the agencies "regard each of these standards as legally severable." J.A. 421.

That makes sense. The agencies were each acting pursuant to different sources of authority and distinct congressional directives, J.A. 421; Phase Two Rule, 81 Fed. Reg. at 73,512, 73,521, and they promulgated their own sets of regulations that were published in separate parts of the Code of Federal Regulations, *see* 40 C.F.R. part 1037; 49 C.F.R. part 535. Although the fuel efficiency and emission standards

accomplish similar outcomes, the agencies were clear during the rulemaking process that one could stand without the other.

To be sure, the agencies "worked in close partnership" to "create a single, effective set of national standards[.]" Phase Two Rule, 81 Fed. Reg. at 73,479. But that does not mean that neither one would have adopted their own standards—pursuant to their own statutory authority and directives—without the other's. Their coordination was not *sua sponte*, but pursuant to both statutory mandate, *see* 49 U.S.C. § 32902(b)(1), (k), and White House directive; *see also* Phase Two Rule, 81 Fed. Reg. at 73,479; THE WHITE HOUSE, IMPROVING THE FUEL EFFICIENCY OF AMERICAN TRUCKS. Importantly, the goal of that coordination was not to create standards inextricably dependent on one another, but to "avoid unnecessarily duplicative testing and compliance burdens" for manufacturers. Phase Two Rule, 81 Fed. Reg. at 73,487.

Nevertheless, the Association insists that the rule's lack of a severability clause is fatal. *See* Association Br. 29. But the law is settled that "[t]he absence of a severability clause cuts neither against nor in favor of severance; the presumption of severability remains intact." *Association of American Railroads v. United States Dep't of Transp.*, 896 F.3d 539, 549 (D.C. Cir. 2018).

NHTSA's regulations also can function sensibly without the EPA's because NHTSA's fuel efficiency limits do not substantively depend in any way on the EPA's emission limits. *Compare* 49 C.F.R. § 535.5(e) *with* 40 C.F.R. § 1037.107; *see Delta Constr.*, 783 F.3d at 1296–1297 ("[N]othing in NHTSA's standards even suggests that they are dependent on EPA's standards * * * .").

Having said that, the regulations currently have an overlapping compliance process. In the rulemaking, NHTSA

and the EPA attempted to reduce compliance burdens and to simplify the process for trailer manufacturers. *See* Phase Two Rule, 81 Fed. Reg. at 73,487, 73,495, 73,664; Phase One Proposed Rule, 75 Fed. Reg. at 74,159. To that end, the regulations are designed so that compliance with NHTSA's regulations also constitutes compliance with the EPA's regulations. *See* Phase Two Rule, 81 Fed. Reg. at 73,640.

The greatest points of overlap include references by the NHTSA regulations to the EPA regulations concerning (i) the compliance equation, *see* 49 C.F.R. § 535.6(e)(3); (ii) the certificate of conformity, *see id.* §§ 535.9(a)(1), 535.10(a)(5); and (iii) the submittal and verification of compliance data, *see id.* §§ 535.8(a)(2), 535.10(c)(4).

Yet NHTSA's regulations could function independently despite this overlap. Trailer manufacturers are already instructed to send compliance information to NHTSA if the EPA's database is unavailable. 49 C.F.R. § 535.8(a)(6). And NHTSA assesses the manufacturers' compliance with its fuel efficiency standards each year. *Id.* § 535.9(a). NHTSA can also seek more information and conduct audits, field testing, and verification testing as it sees fit. *Id.* §§ 535.8(j), 535.9(a)(1); *see also Delta Constr.*, 783 F.3d at 1297 (concluding during the Phase One regulatory process that the NHTSA and EPA regulations could be "bifurcated"). Any lingering uncertainty could be addressed on remand. As for the content of its regulations, NHTSA would need to clean up the cross-references in its own regulations to the EPA's regulations and explain how the compliance equation, certificate of conformity process, and reporting and verification of data would work without the EPA regulations in place.

\* \* \* \* \*

NHTSA's inclusion of commercial trailers in its fuel economy and efficiency regulations was a reasonable interpretive judgment that falls squarely within its statutory delegation.  It is consistent with the Energy Independence Act's statutory text, structure, context, and purpose.  It also comports with statutory and dictionary definitions of the term "vehicle," as well as common usage.  For all of the majority opinion's insistence that Congress's silence can be turned into an express prohibition on the inclusion of trailers, there is simply no there there.

For all of these reasons, I respectfully dissent.